# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

USDC- BALTIMORE
'25 AUG 1 PM 3:48

| | |
|---|---|
| JACOB DOE<br>Plaintiff<br><br>v.<br><br>HEIDI M. ANDERSON<br>RONDALL ALLEN<br>JASON CASARES<br>ALEXANDRA GINTA MARTIN<br>MATTHEW A. TAYLOR<br>CECILIA RIVERA<br>UNIVERSITY OF MARYLAND EASTERN<br>SHORE<br><br>11868 College Backbone Rd<br>Princess Anne, MD 21853<br><br>Defendants<br><br>Serve: Anthony G. Brown<br>Attorney General<br>200 St. Paul Place, Baltimore, MD 21202 | **COMPLAINT FOR<br>DECLARATORY<br>AND INJUNCTIVE<br>RELIEF<br>AND<br>JURY DEMAND**<br><br>**Case No.** JRR 25 CV 25.28 |

---

## COMPLAINT

The Plaintiff is a faculty member at the University of Maryland Eastern Shore (UMES). In early

2024, he directly observed the top administrators of the university engaging in criminal activities

and filed complaints with various law enforcement agencies which initiated investigations in

response. Upon learning about the Plaintiff's complaints, the Defendants took retaliatory actions

under the guise of a fake complaint alleging in December 2024 that the Plaintiff had created a

"hostile working environment" for one temporary worker whose contract was due to expire in two



1

months. Plaintiff has never met Roe alone, never shaken her hand, and never been within six feet of her. Defendants started an investigation by the Title IX Director – an individual who, according to publicly available news media reports, was allegedly a rapist and serial abuser of investigatory processes at several universities previously.

Plaintiff was abruptly ordered to attend a meeting with the Title IX Director on December 6, 2024. Jason Casares and Alexandra Ginta Martin proceeded to give him two sheets of paper: one alleging that he created a "hostile" and "intimidatory" working environment for Jane Roe, and the other placing him on immediate administrative leave. There was no further detail as to what Plaintiff had said or done. At the very first meeting, Plaintiff informed Defendants that he had never met the alleged complainant alone, that there were always witnesses present who would contradict any accusations of impropriety, and that the complainant had an ulterior motive because she was caught committing fraud and her work attendance and performance was dreadful. Further, he informed Defendants that even if the allegations were taken at face value, the complaint would not meet the legal definition. Casares and Martin did not listen; they demanded Plaintiff hand over his keys, id card, and electronic equipment, and had him escorted out by campus police.

The Defendants' unlawful gambit ran aground very quickly when they realized that their procured and fabricated allegations would not meet even the minimal requirements of Title IX. The Defendants then resorted to a new unlawful stunt: the Title IX Director claimed that Title IX is not applicable to the investigation and instead claimed to apply a state law (State of Maryland Policy on Sexual Harassment in the Workplace) ignoring the fact that the Title IX regime is mandatory and that it preempts state law. UMES is a public university receiving Title III and Title IV funds from the US federal government and is mandated to apply Title IX in such cases. All the events claimed in the complaint occurred in the university; Roe was here on a student visa, other students and faculty were witnesses. There is simply no way to avoid the mandatory application of Title IX.

In the investigation, Casares and Ginta Martin violated all due process protections, provided no evidence, no opportunities to cross-examine any witnesses, or otherwise challenge the flimsy and vague fake charges. The Plaintiff's then attorney showed the Defendants that even if their allegations were taken fully at face value, it did not satisfy the definition of harassment or intimidation or hostile work environment. The Defendants issued a finding that even though nothing that the Plaintiffs did was "severe or pervasive," he should be removed from his current role and demoted to a much lower role with half his current pay. The Plaintiff appealed that Title IX was the mandatory applicable law and that the state law was preempted. The appeal authority was Rondall Allen, an unctuous toady of UMES's president Heidi Anderson, and one of the top administrators against whom the Plaintiff had filed a complaint about criminal activity. Rondall Allen had an ulterior motive and was part of the conspiracy against the Plaintiff. The appeal authority denied the appeal without even a pretense of explaining why Title IX was not the applicable legal regime and without considering any of the appeal grounds. As presaged in the Plaintiff's appeal submission, the Defendants' conduct in the appeal only served to underscore that the whole process was a shambolic pretextual witch hunt orchestrated in retaliation against the Plaintiff.

This complaint is being brought to redress the severe harm that has been caused to the Plaintiff by the Defendants' willful and malicious actions. Plaintiff pleads that the court order Defendants to follow the law, apply the correct mandatory legal rules, accord due process protections, and cease their unlawful actions. Assuming arguendo the Title IX does not pre-empt the state law, Plaintiff challenges the constitutional validity of the State of Maryland Policy on Sexual Harassment and asks for a declaration that it is unconstitutional and should be struck down. Finally, the Plaintiff seeks reinstatement to his prior position with full pay and rights, an injunction against acting on the appeal authority's decision, massive punitive damages given the willful nature of the

3

Defendants' actions, a declaration that the individual Defendants' actions do not entitle them to qualified immunity, and an award of substantial damages against individual Defendants.

## I.  PARTIES

1. Plaintiff Jacob Doe resided in Maryland at all times during the facts detailed in this complaint. He is a tenured professor at the University of Maryland Eastern Shore (UMES). All the facts giving rise to this complaint arose in Maryland.

2. Defendant 1 is Dr. Heidi Anderson, President of UMES.  She is a Maryland resident.

3. Defendant 2 is Rondall Allen, Provost of UMES. He is a resident of Salisbury, MD.

4. Defendant 3 is Jason Casares, Title IX Director and Director of the Office of Institutional Equity and Compliance (OIE). He is a resident of MD. At all times, he was an active participant in the unlawful investigation including interviewing witnesses, coercing students, writing memoranda, and making key decisions.

5. Defendant 4 is Alexandra Ginta Martin, Assistant Director of Office of Institutional Equity and Compliance (OIE). She is a Maryland resident. She was the key driver of most of the steps in the unlawful investigation.

6. Defendant 5 is Matthew Taylor, General Counsel of UMES. He is a Maryland resident. At all times, Taylor was a key participant in the unlawful investigation including by providing legal support to the other Defendants.

7. Defendant 6 is Cecilia Rivera, Associate Director, OIE, a key player in intimidating witnesses and fraudulent investigatory practices.

8. Defendant 7 is the University of Maryland Eastern Shore, a constituent university within the University System of Maryland with its principal place of business in Princess Anne, Somerset Co., MD.

9.  Defendant 7 receives Title III, Title IV and other federal funds from the US government, which is the sole reason it is in business. It is required to certify compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 ("Title IX") and is subject to liability thereunder.

## II. JURISDICTION AND VENUE

1.  This is a civil action arising under the laws and Constitution of the United States. This court has jurisdiction pursuant to 28 U.S.C. §§ 1131 and 1367. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02. This court has authority to award costs and expert fees under 42 U.S.C. § 1988.

2.  Venue lies in this district court pursuant to 28 U.S.C. § 1391(b) because the defendants are Maryland residents and all their unlawful actions individually and collectively were conducted within Maryland.

## III. FACTS COMMON TO ALL COUNTS

3.  The Plaintiff took up a position at the University in 2023 with the desire to help improve an institution producing some of the worst outcomes in the nation.

4.  Defendant 1 Heidi Anderson became President of UMES in 2018. She was selected because of a prior relationship with Chancellor Perman of the University System of Maryland despite the absence of any apparent expertise or qualifications.

5.  UMES had a healthy enrollment of about 4800 students when Heidi Anderson took office in 2018, the university's current claimed enrollment is about 3000.

6. Under Anderson's watch, the university lurches from one scandal to the next, academic standards and governance have been willfully sabotaged, and the university has been turned into a diploma mill with low academic standards.

7. Anderson's management ability is illustrated by the fact that her own discipline -- Pharmacy -- has an enrollment of barely 20 new students each year despite receiving egregious favored treatment and the highest amount of university resources. The passing rate for UMES pharmacy students fell to a historic low of 57% this year - one of the lowest in the nation. The pass rate for UMES students was 95% when Anderson started at UMES.

8. Defendant 2 Rondall Allen became Provost around 2022. He has a weak academic record, background in discount pharmacies, and no record meriting a provost position. He was appointed because of strong previous connections to Defendant 1.

9. Defendant 3 Jason Casares was promoted to his current position by Defendant 1 and paid a massively inflated salary in exchange for suppressing complaints against her and her toadies, and intimidating faculty and staff who oppose illegal activities. Casares has a public news media record as an alleged rapist and alleged abuser of Title IX policies at other universities. He is also a named defendant in lawsuits alleging illegal activities in several states.

10. Whistleblower complaints were filed against Casares by UMES employees shortly after his appointment detailing fraudulent claims in his job application. These were ignored. There were subsequent complaints about illegal activities including obstruction of justice, illegal entry, surveillance, intimidation, and conspiracy. Anderson and USM Chancellor Perman ignored them. Casares is a named defendant in lawsuits in every state where he has been employed. Given his shady background, Casares is unemployable in US higher education and his grossly inflated salary and continued promotion by Anderson are bribes.

11. Alexandra Ginta Martin was hired by Casares and paid an inflated salary despite possessing no prior expertise or experience. Her employment was solely for her propensity to engage in unlawful activities. Ginta Martin and Casares share a mutually parasitic and inter-dependent relationship.

12. Matthew Taylor has been the General Counsel of UMES since about 2015. Although he claims that Anderson engages in illegal activities without his knowledge, the record shows that he is a key enabler of unlawful acts by the administration and that he abuses legal rules with *mala fide* intent with full knowledge of illegality.

13. Based on direct observation and expertise in higher education, Plaintiff found one cause of the university's terrible outcomes: rogue administrators led by the president Heidi Anderson and provost Rondall Allen turning the vast investments by the federal and state governments in the university into a private looting opportunity.

14. Unlike other normal universities where administrators are appointed pursuant to merit, credentials, and experience, at UMES many were appointed based on a propensity for corruption and collusion in Anderson and Allen's schemes.

15. Unsurprisingly, under Heidi Anderson, UMES was frequently in trouble with federal investigations, audits, notices of non-compliance, and inquiries.

16. After directly witnessing and determining that there was organized criminal activity to siphon off federal and state funds led by Defendant 1 Heidi Anderson and Rondall Allen, in Summer and Fall 2024, Plaintiff filed reports with the USM Chancellor and Board, and state and federal officials.

17. The USM initiated a cosmetic investigation – intended to save Anderson rather than determine the truth. Its auditors David Mosca and David Mauriello made every effort to not learn the truth.

18. Despite the sham investigation, USM could not avoid learning about various scams under Anderson and Allen reported via the USM Fraud Hotline and interviews.

19. After learning that Plaintiff stood in the way of the criminal activities, Heidi Anderson and Rondall Allen started a premeditated retaliation campaign against him.

20. Jane Roe is an international student who was employed as a data analyst by the Plaintiff as a temporary worker. Her sole ability to work is from her status as a student. She commenced her role on August 19, 2024.

21. Allen, Anderson, and Casares weaponized Roe after learning that Roe had been reprimanded by Plaintiff for submitting fraudulent worksheets and not attending work.

22. On December 5, 2024, after work hours, Defendant 3 Jason Casares asked Plaintiff to attend a meeting on December 6th. He refused to answer what the meeting was for despite two inquiries.

23. On December 6, at the meeting, Casares and Ginta Martin placed Plaintiff on administrative leave accusing him of creating a "hostile and intimidatory work environment" for Jane Roe. Casares informed Plaintiff that a Title IX investigation would ensue in the coming weeks.

24. On December 11, 2024, Professor X, a faculty member and colleague of Plaintiff emailed Ginta Martin stating, "I am the only person who works with [Roe] ... She is a temp worker and I coordinate all communications between two parties. They only met in-person six times (all at the public areas) and one virtual meeting. I arranged all those meetings and was present as an eyewitness on every occasion. Your office has never contacted me for investigation before putting [Plaintiff] on leave."

25. On December 12, 2024, Plaintiff's then counsel wrote to Defendant 5 telling him that "Roe is a temporary employee housed in a separate building" with whom Plaintiff "has met no

more than six times, never more than for a few minutes, and always in the presence of a witness." The counsel's letter named Plaintiff's colleague Professor X who attended every meeting with Roe and witnessed every interaction.

26. Plaintiff's counsel's letter stated "Manifestly, [Plaintiff] has never been in a position to intimidate or harass [Roe]" as Professor X can confirm. The letter noted that counsel is aware that Defendant 4 Ginta Martin is attempting to develop support for Roe's specious accusation.

27. The letter also stated an intention to sue Casares and Roe for defamation and was accompanied by a document retention demand and tort claim notice to the state.

28. Defendant 5 ignored the letter. He did not contact Professor X.

29. None of the Defendants has contacted Professor X to date despite being clearly notified within one week of the accusations about the exculpatory evidence which would have destroyed Roe's accusations and exposed the pretextual witch hunt.

30. Throughout December 2024, individual defendants engaged in a mad scramble to procure anyone to say something negative about Plaintiff as part of a smear campaign.

31. Plaintiff learned about this and obtained sworn affidavits from Jane Coe 1 and Jane Coe 2 testifying that Casares and Ginta Martin had interviewed them under coercion and sought to get them to speak negatively about Plaintiff. Coes 1 and 2 swore under oath that Plaintiff had always behaved respectfully toward them and he was a decent person in their observation and experience.

32. In December, Plaintiff filed a complaint with OIE against Jason Casares and demanded an investigation. This was ignored.

33. In early January, Ginta Martin wrote to Plaintiff summoning him to a meeting as part of her investigation into the accusation.

34. Plaintiff attended the meeting on January 21, 2025 along with his counsel.

35. Plaintiff and counsel both denied the accusations, reiterated that Plaintiff had never met Roe alone, and that her accusations were baseless. They reiterated that Roe had an ulterior motive because she was caught submitting fraudulent work and not attending to her duties.

36. Ginta Martin thrust a 2-page document which contained "Notice of Allegations" at Plaintiff at this meeting.

37. The Notice contained at most 10-15 phrase statements allegedly attributed to Plaintiff. There were no dates, times, or locations. It was a word salad with no indication when they were uttered or in what context. Taking the alleged comments in the most favorable light to Defendants, the worst of the statements were, "people say Turkish women are beautiful, but I prefer Persian women," "all work and no fun makes [Roe] a dull girl," and asking for "pics" of a party Roe attended.

38. Plaintiff responded that the contents were false and nonsensical and concocted and that he would respond in writing. He also challenged the absence of dates and other details establishing that OIE had any jurisdiction in the matter because it was not evident that the comments were made after Roe was employed at UMES – a precondition for OIE's investigatory powers.

39. During the meeting, Plaintiff asked Ginta Martin to provide an update into his complaint against Jason Casares. Ginta Martin was flustered and responded that she would "check and get back to him." The meeting ended.

40. Notably, Roe's contract was due to expire in about 3 weeks from this meeting.

41. On January 21, Ginta Martin wrote to Plaintiff asking him to provide a written response by January 24, 2025: less than 3 days after the meeting.

42. On January 24, 2025, Plaintiff and counsel submitted two documents in response to Ginta Martin: a legal analysis by counsel and factual response by Plaintiff.

43. Plaintiff's counsel wrote that nowhere do the allegations note that Plaintiff's comments were "unwelcome" to Roe and cited *Albero v. City of Salisbury*, 422 F. Supp. 2d. 549 for the proposition that the analysis was objective rather than subjective. Counsel stated, "even if one adopts complainant's allegations wholesale, they cannot constitute sexual harassment as a matter of law because the complainant never objected, protested, or complained about the conduct attributed ... Had she done so, and had [Plaintiff] persisted, then and only then would it have become necessary to determine if the conduct was "severe" or "pervasive".

44. Counsel wrote "[Plaintiff] disputes the accuracy of [Roe's] allegations, even if one assumes arguendo they are true, they fall short of attributing to him a sexual animus..." He reiterated that the "comments are not overtly sexual and certainly fall far short of the severe-or-pervasive standard."

45. Counsel's letter stated that Plaintiff denies any impropriety in connection with Roe and "regards her complaint as pretextual and the University's handling of it as retaliatory."

46. Counsel closed by asserting that the "complaint should be dismissed as untenable."

47. Plaintiff's letter asserted that the accusations were false and the "OIE staff including you are engaging in a pretextual witch hunt against me despite conclusive exculpatory evidence. This biased "investigation" is in retaliation for a criminal complaint filed against UMES President Heidi Anderson last year. On 6th December 2024, during the meeting where I was placed on administrative leave, you and Jason Casares were informed that this complaint was fabricated because I had caught [Roe] submitting fraudulent timesheets to unlawfully take federal funds for hours that she did not work ..."

48. Plaintiff stated he had provided Roe with "critical feedback for impaired cognitive performance on the few occasions she showed up for work and for not producing work products of acceptable quality within deadlines. These documented facts about her unsatisfactory work performance and fraud provided the unlawful motivation for [Roe's] fabricated allegations."

49. Plaintiff's letter to Ginta Martin stated "I have never met [Roe] in person without other employees being present. I have never even shaken her hand. I have never been within 6 feet of her. I have had no physical contact of any kind with her. I categorically reject the allegations as fabricated, concocted, manipulated, and manufactured with malicious motivations."

50. Next, Plaintiff pointed out the Notice of Allegations only had a "word salad that you have deliberately and maliciously sequenced as a monologue with no context, dates, or actual production of the cell phone to create a flimsy innuendo does not constitute sexual harassment, intimidation, or any kind of harassment."

51. Plaintiff noted that "Not a single word in your word salad has any connection with anything sexual."

52. He wrote, "Merely putting random strings of phrases within quotes and selectively ordering them to create a weak and flimsy insinuation does not make them true. Instead, the flimsiness of the innuendo – even assuming arguendo the whole fabrication at face value – highlights how it does not satisfy even the weakest definition of harassment, much less sexual harassment."

53. Plaintiff stated, "Despite your perverse imagination, even assuming the word salad is taken verbatim, only an insane person would assume that things such as a meeting in Washington DC would be harassment or intimidation."

54. Plaintiff also highlighted the fatal flaw in the Defendants' fraudulent allegations: the absence of dates and acknowledgment by individual Defendant 4 that the comments were prior to Roe commencing employment. He wrote: "as you yourself admit, the word salad presented was "temporally" long before [Roe] was an UMES employee. She was not even an applicant for employment. Communications between a stranger to the university and me on matters completely unrelated to the university are beyond the jurisdiction of your office."

55. Further, he reiterated "this maliciously fabricated complaint is a pretextual witch hunt that will not stand up to scrutiny before any rational person much less in any court of law. It does not satisfy the definitions of sexual harassment, harassment, or intimidation. Moreover, no man would sexually harass these individuals, and your insinuations are farcical and absurd. It must be quashed with an apology."

56. In closing, Plaintiff noted that "there has been no investigation into my complaint against Jason Casares despite the passage of over 6 weeks since the complaint was filed, and over three days since you were asked about its status."

57. Defendants provided no response to this strong rebuttal and request to close the investigation started on untenable allegations.

58. Defendants did not respond to the factual denials, legal analysis showing the allegations did not meet the definitions under the law, citations to legal authority, reasoning, or conclusions. They did not respond because they had no response. Their goose was cooked, and the investigation was thoroughly debunked.

59. Defendants employed an evasion strategy. On January 27, 2025, Ginta Martin asked Plaintiff to attend a follow-up meeting side-stepping the written responses provided on the 24th of January.

60. Plaintiff replied that same day stating he had "not received an update about the status of my complaint against Casares. As noted in my response, we have plenty of evidence about the OIE staff's bias and the farcical nature of this unlawful investigation to achieve a predetermined outcome. That will all be brought forward to the appropriate agencies at the appropriate time. Given this, we can do any further follow-ups in writing. Please send me anything that is necessary for me to respond to in writing. You mentioned this was possible during our last meeting."

61. Ginta replied on January 28th stating "the option to submit a written response referred to the Notice of Allegations only, not the follow-up meeting. Therefore, we do need to meet and reconnect in-person during the week of February 3 through February 7, 2025."

62. Ginta Martin's email on the 28th again did not address the clear and convincing denials, legal analysis, and conclusions detailed in Plaintiff's email on January 24th.

63. Plaintiff responded on the same date (28th) asking, *inter alia*, "What happened to the complaint against Jason Casares? Before deciding whether to attend any farcical meeting, I need my questions to be answered in full."

64. On January 29, Kristin MacFarlane, apparently counsel for UMES working in the state AG's Office, wrote to Plaintiff's counsel stating that Plaintiff "is still inquiring about his complaint against Jason Casares (and possibly Alexandra Martin and Cecilia Rivera). The University's position is that OIE staff were simply processing the complaint against [Plaintiff]."

65. On February 6, 2025, Plaintiff wrote to MacFarlane copying her supervisor Katherine Bainbridge: "OIE staff are not "simply processing the complaint against" me. They are engaging in serious unlawful activities. Aside from their specific activities in my case,

USM, UMES, and the AG's office have been on notice about illegal activities by Casares and Anderson for a long time.

So, let's not be disingenuous and willfully blind.

I was simply doing my job when I encountered fraud, its cover-up, willful refusal to follow the law, and was forced to file a whistleblower complaint in June and September 2024.

I was also simply doing my job when I caught [Roe] submitting false timesheets and taking federal funds unlawfully.

If I can be subjected to a witch-hunt for simply doing my job, the excuses to not investigate Casares and gang won't fool anyone. And there is no provision under the rules and policies to simply not investigate these allegations against Casares and gang.

Please do your job in accordance with ABA Model Rules 1.13, 1.1, 1.2(d), 1.3, and 8.4(c) and (d). As you know, your duties are to USM and UMES – not to the criminal gang currently controlling UMES.

I request you to investigate Casares, Martin, Rivera, and others named in the attached complaint. As noted previously, the malfeasance is not solely restricted to my case, and there are serious violations meriting strong action against this gang.

I hope you will do your duty on behalf of Maryland citizens."

66. MacFarlane and Bainbridge simply ignored the email.

67. On February 19, 2025, Roe's contract should have expired thereby bringing to a conclusion this farcical investigation. Apparently, Defendants extended Roe's contract and kept paying her with the sole motivation of keeping the complaint alive. It was a bribe to Roe in furtherance of the conspiracy against Plaintiff.

68. On February 21, Ginta Martin emailed Plaintiff stating, "It is our understanding that you have been communicating with other entities regarding your multiple complaints;

therefore, we encourage you to refer any questions or inquiries related to those complaints to the entities in question. We will continue to focus on our investigation only." She proceeded to list several dates for the in-person meeting.

69. Ginta Martin threatened Plaintiff: "Please understand that failure to respond to this email correspondence by Monday, February 24, 2025, close of business (5pm) with a date/time, and meet with our office by March 7, 2025, close of business (5 pm) will result in you being placed in unpaid administrative leave, pending the completion of the investigation."

70. Ginta Martin also asked Plaintiff: "prior to your arrival, please provide the passcode (that you generated) for your University-issued/owned cell phone. Please include it in your reply to this email correspondence." This was in reference to the cellphone that had been seized by Casares on December 6th.

71. Ginta's email again evaded the submissions made in Plaintiff's January 24th email asking for closure of the untenable allegations as mandated by law.

72. On February 24th, Plaintiff forwarded Ginta's email to the Chairperson of the Board of Regents of USM to report the unlawful threat to put him on unpaid leave. He also inquired:

"What is the status of the complaint I have filed against these people for serious criminal activity? As noted previously, the Iranian hourly temporary worker's (Roe's) contract expired on February 19th. She should no longer be an employee - unless there was an extension provided as a bribe. Her continued employment is also a violation of immigration law. She was caught submitting false timesheets to receive money in addition to other misconduct. There is no basis for any administrative leave action against me, much less unpaid administrative leave. UMES employees with serious complaints by multiple victims have not been put on any administrative leave. This includes Heidi Anderson, her husband Leon Roberts, Jason Casares, and Rondall Allen. Why am I being subjected to this differential treatment based on an absolutely nonsensical fabricated complaint? Jason Casares and Alexandra Martin's salaries were increased shortly after complaints were filed against Heidi Anderson's husband Leon Roberts for lewd behavior toward UMES students in 2021/22. As you know, that case was covered up by a sham investigation conducted by Jason Casares. Clearly, the increase in salary was a bribe paid in exchange for the cover-up.
These are egregious violations of the law and the threat to put me on unpaid leave makes a mockery of reasonable oversight."

73. On February 24, 2025, Plaintiff wrote to Ginta Martin attaching a legal memorandum. In

the text of the email he wrote:

"My email below asked you about the complaint against Jason Casares that was submitted
to **you**. It has nothing to do with any other entities or their actions. You said during our
meeting in January that you would update me on the status of the complaint. Was that
another lie?

Survey after survey of UMES faculty and staff has documented that you and your OIE
colleagues lie and cheat. So, your reputation for dissembling is rock-solid and that's why I
refused to attend any meeting with you in person. As many other UMES employees have
documented, statements made in your office to you, Casares, and Rivera are invariably
distorted and bear no resemblance to what is actually stated. I am happy to participate in
any objective true investigation, just not fake investigations by people documented to be
liars.
Under applicable law and UMES policy, you cannot evade the complaint submitted to
you against Jason Casares in December 2024. What is the status of that complaint?"
Re the investigation you referenced below, where is the actual complaint? Please send me
a copy of the actual complaint allegedly submitted by [Roe]. Notably, her contract ended
on February 19, 2025. What is her current employment status?"

74. Plaintiff continued "you will know that you cannot investigate yourself. So, let me know
who USM/UMES nominates to conduct this investigation and I would be happy to
participate.
Previously, when told that your actions may be violating the law and you may be held
liable in a court, you have scoffed dismissively, exhibiting contempt for the rule of law.
Other faculty have also reported similar conduct by you - visibly sneering at mentions of
the court."

75. The email text specifically asked for an opportunity to cross-examine Roe and another

witness used by Ginta to pad her false allegations:

"... you have not indicated the date when I may cross-examine [roe] and [her friend]. Please
provide some dates and times for me to review for the cross-examination.

Aside from the cross-examination in person, I am happy to meet with an objective
investigator to discuss the complaint including the ones against OIE staff. This meeting
can be scheduled in virtual format so that we can record and transcribe the proceedings and
avoid the kinds of dissembling you are renowned for.
Finally, please pass on the attached motion to dismiss [Roe's] complaint under section
106.45 (3) of Title IX to your superiors at USM. You have no discretion: the statutory

section states you "must dismiss" because none of your allegations satisfy the definition of sexual harassment in Title IX, even if proved. I am not asking for dismissal of the complaint under any eleemosynary considerations, just based on my legal rights which have to be respected."

76. The memorandum attached to that email asked for a copy of the complaint filed:
   "You have alleged that there is a complaint in which I am a Respondent. Where is this complaint?
   I have not been provided with a copy. Please provide a copy immediately."

77. The memorandum argued that the definition of harassment was not satisfied:
   "Under Title IX, in material part, sexual harassment "means conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."
   Your notice of allegations contains nothing that satisfies the definition of sexual harassment in Title IX. There is nothing even remotely sexual in the word salad you have stated in your Notice of Allegations, no 'sexual conduct,' no 'unwelcome conduct' of any kind, and nothing that is 'severe, pervasive, or objectively offensive.'

78. Next, the memorandum attacked the Plaintiff's being placed on leave:
   "The administrative leave action you have taken runs afoul of what is permitted by Title IX. It is disciplinary, punitive, and unreasonably burdens me. My work area is about half a mile from [Roe's] office and I have never met her one-on-one and had no contact with her on a daily basis. In fact, my interactions with her were minimal and always in the presence of others. [Roe] was caught submitting false timesheets to receive federal funds illegally, performing poorly at work, and reprimanded. She is an hourly worker and was taking federal money without working the hours claimed. In other words, she was engaging in fraud.
   You have continued to pay her since December without doing any work. This is violative of Title IX's appropriateness and reasonableness requirements."

79. The memorandum highlighted the biased and predetermined nature of the investigation:

   "The termination of my email, banning me from campus, ... telling people on campus that

   I have been fired, stopping my important work, posting my photograph in the campus

   police department, defaming me with students, etc., are all unreasonable burdens. This is a

   clear violation of Title IX's injunction against such unequal and unreasonable action.

Notably, section 106.44(a) states in material part that "A recipient's response must treat

complainants and respondents equitably by offering supportive measures as defined in §

106.30 to a complainant, and by following a grievance process that complies with § 106.45

before the imposition of any disciplinary sanctions or other actions that are not supportive

measures as defined in § 106.30, against a respondent." (emphasis supplied)"

80. The Plaintiff's February 2025 memorandum exposed Defendants' bias:

"Section 106.45 requires that you conduct "an objective evaluation of all relevant

evidence—including both inculpatory and exculpatory evidence—and provide that

credibility determinations may not be based on a person's status as a complainant,

respondent, or witness." Here your actions have been the exact opposite of objective - it

has been biased from the start and designed to obtain a predetermined outcome. Jason

Casares, Alexandra Martin, Jocelyn Reader (a pharmacist toady of Heidi Anderson and

Rondall Allen) and Cecilia Rivera have been frantically trying to pad the fabricated

complaint by pressuring others on campus to make up falsehoods. Casares interviewed

potential witnesses and tried to coach them. Rivera's communications to potential witnesses

violated OIE policies and Title IX provisions and exhibited bias. The facts conclusively

establish partisanship and a ready desire to take the complainant's side without any

evidence of wrongdoing or concern for due process."

81. The memorandum specifically highlighted that Defendants had not contacted Professor X

at all despite her being identified as early as December 11th as possessing conclusively

exculpatory evidence. Professor X had directly emailed Ginta Martin stating that she was

a witness to every interaction but received no response at all. The memorandum noted:

"The statutory mandate to evaluate exculpatory evidence has been completely ignored. There is incontrovertible evidence that [Roe] was submitting false timesheets, showing up for work cognitively impaired because she was under the influence, and that her work performance was poor. These are documented facts and establish a motivation to file a false complaint. It also establishes that she has no credibility at all. A fraudster shown to be filing false timesheets and reprimanded therefor must be taken to be lying in this complaint. Similarly, there is incontrovertible evidence that I never met [Roe] alone, never was within 6 feet of her, and had no inappropriate interactions with her. The word salad of fabricated statements, even assuming them to be true (which they are categorically not) shows absolutely no sexual animus or content and are banal statements even on the most generous construction to the alleged complainant."

82. The memorandum highlighted Defendants' conflict of interest and bias:

"You and OIE staff are biased and have an actual conflict of interest. You procured this complaint in conjunction with Heidi Anderson's gang including Jocelyn Reader and Rondall Allen in retaliation ... It stands to reason that you are acting in a biased manner and want to arrive at your predetermined outcome because you have a conflict of interest."

83. The memorandum asserted that Defendants violated the presumption of innocence:

"Your conduct in this investigation, specifically, the procurement of a fake complaint, pressuring others to make negative statements against me, and the statements by you and team that I have been fired, the removal of my bio from the website, the termination of my email address, the termination of my research projects, all show that you have not maintained the presumption of innocence."

84. The memorandum challenged the jurisdiction and procedural errors by the Defendants:

"OIE also violated section 106.45(2) which requires specific steps to be taken in relation to the Notices of Investigation and Allegations. You have not complied with those requirements and violated my procedural due process rights. These violations are not trivial - they are substantial and establish that your office lacks jurisdiction in this matter given your own admission in January that many of the alleged statements were before [Roe] was an employee of UMES.

The violations are fatal to your case."

85. Finally, the memorandum asserted Defendants' legally binding duty to dismiss the complaint:

"Section 106.45(3) mandates OIE to dismiss a complaint when "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved." We have explained to you in considerable detail in previous communications and hereinabove why the allegations do not meet the Title IX definition of sexual harassment. As such, you have no recourse but to dismiss. The statute uses the words "must dismiss" and the language is binding and unambiguous. Failure to follow this statutory mandate will compound your errors and further prove your actual malice throughout this matter. In addition, the complaint should be dismissed because [Roe's] contract ended on February 19, 2025, and there are serious violations of due process by you in this investigation."

86. Ginta Martin provided no response to the text in the email of February 24th or the attached memorandum. She did not because she had no answer. Ginta Martin and Defendants just evaded her legal duties and continued in her unlawful and malicious actions.

87. On February 26th, Ginta Martin resorted to evasion again – ignoring the text and attached memorandum and instead asking Plaintiff to attend another meeting. She stated: "If you still refuse to participate in all aspects of the investigation, particularly an interview, the investigation will proceed without your interview. Your written materials will be noted but cannot replace an interview."

88. She wrote on March 3rd again providing no response to the demands for a copy of the complaint, the evidence, an opportunity to cross-examine witnesses, etc., mentioned in the

memorandum and previous emails. Ginta Martin continued with the evasion strategy asserting, "Please note that responding to questions via email and/or in a document is not acceptable nor the same as an in-person interview. Again, your written materials will be noted but cannot replace an interview." Ginta Martin cited no rule, law, or other provision to support her assertion.

89. Plaintiff replied on March 4th:

"Good afternoon, Ms. Martin. It is common knowledge at UMES that you do not like to obey the law and have contempt for legal institutions. Regardless of your tendencies and your lack of qualifications, as the "Assistant Director for Civil Rights," you have no choice but to follow the mandates of Title IX and the US Constitution.

All interactions between you and I are to be conducted within the boundaries of Title IX. If the statute says you must do something, you <u>must</u> do it whether you like it or not. If you make any demands, you must reference a statutory provision that supports your claims. I regret that I cannot indulge your whims."

90. The email specifically inquired about a lack of response to the points made by the Plaintiff in the February 24th email and memorandum:

"It appears that you have not read my email response sent on February 24th. Please read it carefully again (text below in addition to the attachment submitted on 24th), consult with your superiors at the University System of Maryland office, and have them respond to the questions posed. As noted, you must follow the mandatory provisions and must dismiss the complaint against me as per the directive of Title IX.

Finally, given the allegations of criminal activities by you in this investigation, you are asked to recuse yourself from any further involvement in this matter until the investigation against you is completed.

I look forward to receiving the responses to my questions."

91. Ginta Martin and Defendants provided no response to this email.

92. There was no communication from Defendants at all for over 6 weeks from this email of 3rd April 2025.

93. Defendants were in no hurry, exceeded all their deadlines whilst imposing harsh ones on Plaintiff, and had the ability to reflect and consult counsel to follow the law. They deliberately chose to act unlawfully.

94. Abruptly, on May 19, 2025, Ginta Martin resurfaced with an email claiming to have concluded the investigation and asking Plaintiff to attend a meeting to review a "preliminary report" beginning May 20th and offering some dates and times. She claimed "we typically allocate two hours for the review. If you need additional time, we will schedule a second meeting."

95. Plaintiff was due to travel overseas during that time for a 2-week trip.

96. On June 2nd, when Plaintiff was overseas, Ginta-Martin emailed again sending a document purporting to be the Final Report of the investigation. Ginta's eagerness is shown by the fact that she could not even adhere to her own deadline.

97. On June 2nd, whilst overseas, Plaintiff replied:

98. "Hello Ms. Ginta Martin, I see that you have not learned anything. I have not received a response to my email sent to you on 4 April 2025. It is pasted below in case you have forgotten. I had inquired about my right to examine your "evidence", cross-examine the alleged complainant, and the status of my complaint against the rape-accused Jason Casares, amongst other matters. The legal memo submitted then and the letter submitted previously by my then attorney conclusively showed that your only legal option was to drop this fake investigation and apologize to me.

99. Your so-called final "investigation" report is nothing but a shambolic pack of lies designed to achieve your predetermined outcome. Your kangaroo court has not even followed your own processes. Perhaps you do not know that the Maryland law you reference is pre-empted by federal law? Which attorney advised you to draft this ridiculous report? It will be laughed out of court."

100.    The email further stated, "I am overseas and could not have attended your meeting to review your "preliminary" report. The unholy haste with which you have acted even before your own time-frame lapsed shows that there was no real review or anything

preliminary - this was an amateur stitch-up job by a bunch of bumbling criminals from day-one.

The criminals will be found out in court. And you can bet that I will appeal this nonsense."

101.    The "Final Report" which is nothing but the identical preliminary report purported to make "findings" against Plaintiff. Defendants imposed a massive demotion in rank as a sanction, a reprimand on Plaintiff's file, and "training". Despite their actual malice, desperate attempts to manufacture evidence, coerce witnesses, and violate the laws, they had to conclude that Plaintiff's actions were not "severe or pervasive." The document was illogical, lied about witnesses interviewed, was not supported by any evidence, and exhibited circular and incoherent reasoning. Its fatal flaws will be outlined in the appeal paragraphs.

102.    On June 2nd, Plaintiff forwarded Ginta Martin's email to Matthew Taylor, Defendant 5 stating:
"Hello Matt, Please see below. I am not sure you had a chance to review this predetermined hogwash. You know very well that I did not harass anyone or create any hostile environment for anyone... Unlike these trashy individuals, you went to a decent law school and took an oath to follow the law. Please uphold your responsibilities. No paycheck is worth sacrificing one's conscience for. If I had not reported the criminal gang at UMES they would not have fabricated this and acted with such alacrity. Remember this is a group that cannot do even the simplest things within time - that Anderson cannot even type a simple email without ChatGPT. Why did they put me on leave within days of a procured fabricated complaint and act as if I was fired even before any investigation?? The whole thing will be blown up in court and I am determined that these crooks will go to jail.

Please observe your oath, read my legal memo attached, and provide a confidential statement about the many illegal activities of the Anderson gang to the Attorney General's office and the DoJ.
The only legal avenue open to UMES is to drop these fabricated allegations bereft of any evidence and apologize to me."

Defendant 5 Matthew Taylor did not respond.

103.        On June 5th, Plaintiff forwarded the email to Katherine Bainbridge and her colleagues in the Maryland Attorney General's office and wrote:

Good morning. I hope you are doing well. Please see the below. Are you aware of the grotesque and willful violations of basic due process by the crooks at UMES? Ms. Bainbridge, did you see the memo I sent in February 2025 asking for specific details about the allegations against me? To date, I have not been provided with the dates on which I am alleged to have created a hostile environment/harassed the alleged complainant.... or any evidence. As you know, due process requires that I must be provided with the specific allegations, the dates and times when offensive conduct is alleged to have occurred, an opportunity to examine any evidence advanced to support the allegations, and the opportunity to cross-examine the accuser to establish the credibility of the accusations. Any first-year law student would know this, and surely, you all know that these basic minimum guarantees are owed to anyone in the US.

Given that, are the gross violations of my constitutional rights being orchestrated with your knowledge and consent?

You know that the UMES administration are a bunch of crooks... They are running a diploma mill to steal federal and state funds. The previous provost, CFO, and head of Human Resources were all pushed out illegally because they were honest and resisted criminal activity.

The UMES Office of Institutional Equity (OIE) is headed by a rape-accused individual named Jason Casares, who has been the subject of numerous complaints about serious illegal activities with his cronies Alexandra Martin and Cecilia Rivera. Your office has been notified about these complaints. They are being paid grossly exaggerated salaries and benefits as bribes in exchange for illegal acts in aid of the Heidi Anderson criminal gang. The fake claims against me were fabricated because I exposed fraud and [Roe] is just a poor stooge used by the Anderson gang.

The fake and fabricated allegations against me will collapse with the simple responses to these basic questions:

What were the remarks constituting harassment/hostile behavior?
When did the conduct occur? What are the dates for each comment?
What was the response of the supposed victim?

The refusal of the OIE to answer these basic questions shows they know their fabricated house of cards will collapse.

From the claims, it appears that some of the comments were made before ... (alleged complainant) even applied for a job at UMES or was under any realistic prospect of such employment.

25

If my comments were hostile or harassing, why did she then subsequently apply for the job to work with me and move all the way to UMES? Even a 10-year old child can see the contradiction.

If I was hostile or harassing her, why did [Roe] request me for a loan? She could have asked her fellow countryman [A] (an Anderson gang-member with numerous current complaints being suppressed by OIE) or others. I can show you her text messages which clearly contradict any iota of harassment or hostile behavior.

The fact is that I was only charitable and generous to her.

Even assuming for the sake of argument that her claims are true (which they are absolutely not), there is nothing sexual or harassing about the comments. It simply does not meet the required legal threshold - see attached memo from my previous counsel.

We have witnesses who will testify that [Roe] was a chronic absentee at work from day-one and that her work performance was abysmal. When she was caught submitting fraudulent timesheets and not doing her work, she fabricated this complaint with the Heidi Anderson gang because she feared being deported for violating the conditions of her visa.

We also have witnesses who will show that [Roe's] claims about being distressed are all lies. She has been spotted partying with drugs and alcohol and entertaining random men at a location in Salisbury with an associate who self-describes herself as a "pole dancer." The appearance of immoral activities is reported and investigation may expose consideration for these acts with the random men.

Alexandra Martin's so-called report is full of lies including her list of witnesses. She has deliberately omitted the names of witnesses who provided clear and contradictory testimony to [Roe's] claims. Three students and a full professor of repute were witnesses interviewed by Martin/Casares. They contradicted [Roe's] version but Casares and Martin deliberately omitted these pieces of evidence because they were destructive to [Roe's] claims. We have sworn affidavits from these witnesses about the attempted coercion by Casares and Martin to speak negatively about me. The omission of these testimonies is so amateurish and so prejudicial that it alone destroys the fake case against me.

Casares and Martin are spinning a fantasy about me having some preference for Iranians. This is absolute nonsense. Attached is a statement from six female Iranian students about how my behavior with them was absolutely professional and respectful. I also have sworn statements from two other Iranian female students stating that my conduct toward them was absolutely professional.

Many Iranians were hired because UMES is not a selective university and we had to take what we could get. The Iranians applied and were selected to work on projects by top faculty at UMES. I did not show any favor and the hiring was by others. My projects had people from many nationalities and they were all treated based on merit.

I have never met [Roe] alone and every interaction was with other witnesses present. Every meeting was in a public, observable place. I have never been within 6 feet of her. This is conclusive evidence to destroy any implication of sexual animus. To put it bluntly, I made every effort to stay as far away from her as possible - a fact observed by others. And the reason why meetings with her were organized in large open areas where I sat as far away as possible - often at the extremity of the room - was to avoid the stench from [Roe's] poor hygiene.

Despite being told this in writing, Martin and Casares did not interview the witness (an eminent professor named X) who would have directly contradicted Roe's fake complaint. X observed every interaction I had with Roe and managed her day-to-day work. She has information essential to any investigation in this matter but has not been contacted by OIE staff. Why?

X and numerous other female faculty and staff at UMES will testify in court that I have been very respectful and professional in my interactions with them.

They and others will also testify about the many illegal activities of Casares, Martin, and other criminals at UMES.

We also have copies of emails written by Martin and Rivera to others about this case in violation of their own confidentiality requirements. The list of due process violations is long and destructive of any notions of an impartial investigation. It would be an embarrassment to the OAG to defend this.

Ms. Bainbridge, unlike Heidi Anderson, Casares, and Martin, you went to a good law school and took an oath as an attorney. They are base individuals who will stoop to any depths. You are an officer of the court and are working for the state. How can you participate in these grotesque abuses of due process and enable the willful harming of an innocent man?

The USM hotline has received information from faculty about illegal activities by Anderson's gang. Have you asked them to show you those complaints? David Mauriello and Mosca were given specific information by faculty. It is impossible to hide any of this.

How are you going to stand up in court and defend the actions of these criminals? Are you going to stand on the side of criminals, a rape-accused, and a liar making fake accusations after submitting fraudulent timesheets? Are you going to defend retaliation against an innocent man who exposed fraud? It will destroy your credibility as attorneys and bring disgrace to the OAG and the Governor when all of this becomes public.

Further, [Roe] is a temp worker whose contract expired in February. Why was it renewed other than to keep the fake case against me alive? As you know, given the fiscal deficit, temporary contracts are not to be renewed per state government directives. The USM and UMES are under severe financial distress and all hiring and renewals are to be paused. So, what is the source of funding for [Roe's] contract to be renewed? Who authorized this and for what legitimate purpose?

27

Please answer these questions. Evasion won't be helpful and this is the last opportunity before I go to court. The questions will inexorably have to be answered in court. It would be better for the USM to not go there because UMES will be exposed in public as the criminal organization it has become under Heidi Anderson. Many employees who have detailed insights will provide testimony at trial and I cannot wait to take depositions of Jay Perman, Heidi Anderson, and Jason Casares.

Please put an end to the illegal activities at UMES and fulfil your obligations as officers of the court.

I am happy to provide any further information you may need."

104.    Surprisingly, Katerine Bainbridge did not respond.

105.    On 8th June, Plaintiff again wrote to Bainbridge to follow-up:
"Hello Ms. Bainbridge and colleagues, I have not received a response to my previous email. Do you have anything to say about the grave violations of my constitutional and legal rights by the criminal gang at UMES? OAG colleagues, please assist. There is willful illegal activity of the most gross sort here and nothing is being done by the OAG official who is supposed to oversee these crooks. ... I have not been provided even the most minimal procedural and substantive due process rights mandated by the US Constitution, Title IX, and numerous court decisions.
I do not know when the comments alleged to have been harassing were made, what proof exists, or an opportunity to examine credibility despite numerous requests in writing. No dates, times, or any evidence has been provided to me to date. The rape-accused Casares and his cronies are acting as judge, jury, and executioner in exchange for bribes paid by Heidi Anderson.
I have never met the alleged accuser alone, and never been within 6 feet of her. Every interaction was in the presence of witnesses and there is absolutely no truth to this fake case.
The alleged accuser was caught committing fraud and has no credibility whatsoever. Even taking her claims at face value, the comments do not constitute harassment. The Title IX office does not even have jurisdiction in the case because the comments appear to have been made before the person was even an applicant for employment. Her subsequent conduct, the timing, and other contextual evidence destroys any possibility that she felt harassed.
The whole thing is a scam - a pretextual witch hunt by a bunch of crooks seeking to escape jail for their crimes.
Please see the attached. I urge you to do the decent thing and compel these crooks to act within the boundaries of the law.
It brings your office very little credit to enable the violation of the constitutional rights of an honest, innocent person in this way. Thanking you, Sincerely,"

28

106.    Plaintiff attached sworn affidavits from 2 witnesses who testified about being coerced in interviews by Casares and Ginta Martin.

107.    Plaintiff also attached a statement by 6 female Iranian students that Plaintiff had only behaved respectfully with them. This statement was not solicited by Plaintiff directly or indirectly. It was spontaneously offered by the students themselves. The statement emphasized their "full and unwavering support" for Plaintiff and stressed that he has consistently served as a dedicated academic mentor, advocate and principal investigator who has guided us through our research journey with utmost professionalism, compassion, and integrity."

108.    The statement by the 6 female students communicated their apprehension about the "apparent campaign to discredit [Plaintiff]. These actions are, in our view, unfounded and represent a misuse of institutional power and jeopardizes not only his reputation but also our educational futures."

109.    Critically, the students clearly stated they had never witnessed "any misconduct or mismanagement" by Plaintiff and "on the contrary, he has always acted in accordance with university and federal guidelines and has tirelessly advocated for our academic rights."

110.    The students ended by pleading for Plaintiff to be "treated fairly and any attempt to falsely implicate him be stopped immediately. He deserved institutional protection not retaliation for standing up for truth and student welfare."

111.    Again, there was no response from Katherine Bainbridge and her colleagues.

112.     Plaintiff submitted his appeal form and submission in a timely manner on June 9th,

asking Ginta Martin to "Please identify the appeal authority so that additional information

may be delivered directly without your manipulation. Ensure that [Roe] receives these

documents. I am very much looking forward to seeing you in court shortly for you to face

the music for your intentional illegal activities. The OAG staff are being copied to ensure

that there is no pretence about their lack of knowledge of these illegal acts by your gang. ..."


113.     Ginta Martin acknowledged the email on the 9th but did not identify the "appeal

authority."

114.     Plaintiff's appeal submission challenged the nonsensical "findings" noting the

pretextual nature of the investigation and bias throughout: "The "report" is absolute

gibberish - trademark Casares and Ginta Martin work-product full of lies and exhibiting

the logical reasoning ability of a mentally retarded child.

The OIE crooks even lie about the most basic facts such as the witnesses interviewed --

conveniently omitting the names of several witnesses they interviewed from the list on

page 3 of their fraudulent report. Casares, Ginta Martin, and Rivera are seemingly oblivious

to how easy it is to destroy their lies in court. For example, we have sworn testimony from

individuals who are not named as "witnesses" that they were in fact interviewed by Casares

and Ginta and attempted to be coerced."


115.     Plaintiff was under no illusion that the appeal would also be biased against him
writing: "This appeal and complaint about UMES engaging in gross due process violations
and infringing upon [Plaintiff's] rights is being submitted without any expectation that the
OIE crooks will follow the law in this appeal. Rather, the anticipated illegal actions during
the appeal will only underscore their criminality and add to the devastating legal
consequences they will face in court shortly."

116.    Plaintiff's appeal submission started by challenging the willful refusal to follow mandatory law:

" The violations of applicable legal protections are willful, malicious, and with the apparent aid of the UMES General Counsel. Absurdly, the OIE crooks err even about one of the most basic questions in this case: the applicable legal regime. Given that a first-year law student would be able to read and apply the mandatory legal regime -- Title IX -- the error must be considered willful and malicious. Notably, the OIE crooks started this fake investigation under Title IX but after realizing that their fake case would go up in smoke, now claim for the first time in their "Final Report" that Title IX does not apply. Only a moron or imbecile would now claim in a footnote that Title IX does not apply to this case: "the OIE/the Title IX Coordinator determined that the allegations did not fall under the "2020 Title IX Rule."

Sadly, for the OIE crooks, such wishful thinking will not prevent applicable federal law from nailing them. Like the average criminal who claims he was not aware of the law or that it does not apply to him whilst violating it, the OIE crooks will meet the same end: accountability in court and harsh punishment."

117.    Plaintiff showed why Title IX is mandatory by its own language:

"The OIE staff and the UMES General Counsel apparently cannot read and comprehend the plain text of Title IX itself which mandates its application and are not aware of the supremacy of federal law under the US Constitution. UMES General Counsel has apparently not advised the OIE crooks about the preemption doctrine and the fact that Title IX must be followed and that its due process protections must be afforded in any such investigation at UMES. The US Department of Education's explanatory memorandum issued whilst promulgating regulations states: "Title IX applies to all recipients of Federal financial assistance, whether the recipient is a public or private entity and regardless of the size of the recipient's student body (emphasis supplied.) Fair, reliable procedures that best promote the purposes of Title IX are as important in public schools, colleges, and universities as in private ones, and are as important in large institutions as in small ones. The final regulations therefore prescribe (emphasis supplied) a consistent grievance process for application by all recipients without distinction as to public or private status, or the size of the institution."

118.    Plaintiff explained that UMES receives federal financial assistance which is conditional on the university adhering to Title IX: "UMES is a recipient of federal financial assistance. It cannot exist without such assistance. Therefore, UMES must follow the mandate of Title IX. The deliberate refusal to follow Title IX by itself means that UMES is discriminating against [Plaintiff] based on sex. UMES's illegal actions will meet harsh administrative enforcement by the US Department of Education terminating its eligibility for receiving federal funds and by way of private litigation for substantial money damages. This flows from Supreme Court case law including decisions such as Cannon v. University of Chicago, 441 U.S. 677, 717 (1979). As the court explained in Cannon, "Title IX ...

31

sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices."

119.    The appeal memo stated that "If any attorney can offer any putative legal reasons to support UMES's position, [Plaintiff] is happy to provide additional legal argumentation with supporting case-law. This memo is also being sent to the Office of Attorney-General so that there cannot be any pretense to lack of knowledge."

120.    In the memorandum's factual background section, Plaintiff highlighted that Roe was in the US on a student visa and was hired to her temp position under that visa: "Optional Practical Training (OPT), by definition, is part of educational activity at a US public university receiving federal funds - meaning that the OIE crooks' claim that Title IX does not apply in this case is absurd from the start."

121.    It noted that Roe came to work cognitively impaired "smelled of weed or alcohol on numerous occasions and was frequently confused and clueless about basic matters such as the day/date and time, work instructions, deadlines, performance expectations, locations, names of UMES personnel, events, etc."

122.    Plaintiff explained that "[Roe] did not seem to comprehend basic work instructions, could not work independently, and was not producing written work. [she] was requested to provide a daily report of her work activities prior to closing her time-sheet at 5pm each day. This was intended as a sound management practice to document progress and to ensure our compliance with the use of federal funds. [Roe] failed to upload daily work reports despite numerous reminders.
 When it became impossible to ignore that [Roe] was submitting fraudulent time-sheets, [Plaintiff] sent her a polite email inquiring if she was actually working the hours claimed. [Roe] admitted that she was not working the hours claimed. [Plaintiff] responded that if the variance was just a few minutes, it was fine because it would be considered trivial.
By November, it became obvious that the variance between [Roe's] submitted time-sheets and the hours worked was not trivial or minor. [Roe] seemed to be engaging in a deliberate practice of deception claiming substantially more hours than she worked, was more interested in non-work activities, having a good-time, and securing permanent employment at UMES rather than performing her assigned work duties.

After failing to meet important work product delivery deadlines in November and being unable to explain her tardy performance, [Plaintiff] emphasized to her in two meetings in November that [Roe] would have to improve her work performance. In a polite and respectful manner, [Plaintiff] told [Roe] that her work had to be comprehensible, that there had to be discernible logical sequence to the written materials submitted, and minimum standards had to be met.

In late November 2024, [Roe] apprehended that her contract would be terminated and that she may be deported to Iran for fraudulently submitting time- sheets and taking federal funds. In addition, the consumption of drugs is a violation of immigration law."

123.    Plaintiff outlined various other facts showing a conspiracy between Defendants 1, 2, and other toadies of Heidi Anderson.

124.    The memorandum outlined a legal analysis noting, the "applicable legal regime for harassment allegations in the educational environment is provided by Title IX. In fact, this is why Casares and Ginta Martin referenced Title IX as the applicable law during the meeting on December 6, 2024. Subsequently, they realized that their fake case would collapse after the fatal flaws in the fake allegations were pointed out by [Plaintiff] and his then legal counsel ... To escape from their fake case blowing up in their faces, now Casares, Rivera, and Ginta Martin claim in a footnote on page 2 of their fraudulent report that Title IX does not apply to their fake case -- contradicting their own previous position."

125.    No reasoning was provided by Defendants for why Title IX was inapplicable.

126.    Plaintiff explained the nature of mandatory rules: "Unfortunately for the OIE crooks, mandatory legal obligations cannot be picked and chosen only when convenient and based on their whims. Mandatory legal obligations are precisely that - compulsory and applicable regardless of whether the OIE crooks like it or not."

127.    Section 1 of the appeal memo explained by Title IX is the mandatory regime: "The 2020 Title IX rules are the mandatory legal rules governing this case. As the US Department of Education elucidated in its explanatory memorandum in 2020,
"Title IX applies to all recipients of Federal financial assistance, whether the recipient is a public or private entity and regardless of the size of the recipient's student body. Fair, reliable procedures that best promote the purposes of Title IX are as important in public schools, colleges, and universities as in private ones, and are as important in large institutions as in small ones. The final regulations therefore prescribe a consistent grievance process for application by all recipients without distinction as to public or private status, or the size of the institution."

That memorandum also recognized that UMES has additional obligations: "some recipients are State actors with responsibilities to provide due process of law to students and employees under the U.S. Constitution, including the Fourteenth

Amendment." UMES is a state actor - it is a university within the University System of Maryland and is a public university bound to provide protections under the Constitution including the Fourteenth Amendment. Section 106(6) (b) is unambiguous in its text: "The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part."

128.~~~ ~~~ Next, Plaintiff asserted that Casares and other~Defendants' refusal to follow mandatory laws was willful and malicious: "Section 106(6) (d) underlines the inalienable nature of constitutional protections that must be guaranteed to [Plaintiff]: "Nothing in this part requires a recipient to: (1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution; (2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or (3) Restrict any other rights guaranteed against government action by the U.S. Constitution." And section 106(11) relating to scope of application is equally unambiguous: "this part applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. For purposes of this section, conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution, and conduct that is subject to the recipient's disciplinary authority." Simply put, Casares and his toadies have no escape from Title IX and have been hoisted on their own petard."

129.    Plaintiff noted that Casares had violated procedures governing how complaints are to be processed from the inception: "Casares has flip-flopped on the applicable grievance procedures and willfully violated the provisions of section 106 applicable to the conduct of grievance proceedings. The statute does not transition all complaints automatically into a formal grievance process. It stipulates a number of factual and evidentiary thresholds for the Title IX coordinator to satisfy in section 106.44 (f)(v) A."

130.    Plaintiff submitted that "Casares did not follow the mandate of this section at all. The allegations were completely spurious, not severe or repeated, and had nothing even remotely sexual. As such, Casares had a duty to dismiss the initial complaint and not initiate a formal grievance process."

131.    Plaintiff asserted that Defendants violated provisions related to supportive measures and avoidance of bias: "Casares had already typed up the letter placing [Plaintiff] on administrative leave even without giving him an opportunity to be heard before the first meeting on December 6, 2024. This was a willful and malicious violation of basic due process. It shows that Casares was never interested in assessing the merits of the allegations, had predetermined the outcome to suit his criminal masters, and was absolutely biased. It also conclusively establishes that Casares showed no interest in any informal process

despite the ample evidence that the claims were false and even taken at face value had not occurred anytime close to 6th December. Further, there were ample facts contradictory of any harassment: application for a job by [Roe] after the comments were allegedly made, relocation by [Roe] to Salisbury after the comments were allegedly made, submission of fake time sheets by [Roe], reprimanding of [Roe] for bad performance and cognitive impairment, the evidence that [Roe] requested money from [Plaintiff], etc."

132.    Plaintiff appealed that UMES violated mandatory grievance procedures: "Section 106.45 of the statute elucidates the procedures to be followed by UMES. It is also phrased in language that admits of no ambiguity and is mandatory: "A recipient's grievance procedures for the prompt and equitable resolution of complaints of sex discrimination must be in writing and include provisions that incorporate the requirements of this section." The language used is "must" and Casares and minions cannot dispense with section 106.45 by claiming in a footnote that it is not applicable."

133.    Plaintiff appealed that he was not treated equitably as required by section 106.45(b):"The factual record shows the complete opposite - absolute bias and malice toward [Plaintiff] for nefarious purposes. Clause (2) prohibits Casares and his minions from having a conflict of interest. Here the factual record reveals an absolute conflict of interest. [Plaintiff] filed formal complaints under Title IX with the Human Resources Office and the University System of Maryland against Casares, Ginta Martin, and Rivera. Ginta Martin made a sarcastic remark "encouraging" [Plaintiff] to continue to complain to others - under the mistaken notion that taxpayers would pay to defend her illegal acts."

134.    Plaintiff appealed that Defendants had violated statutory requirements for notices: "106.45(c)(1)(ii) mandates that the UMES issued Notice must contain "Sufficient information available at the time to allow the parties to respond to the allegations." The statute defines "sufficient information" as including "the identities of the parties involved in the incident(s), the conduct alleged to constitute sex discrimination under Title IX or this part, and the date(s) and location(s) of the alleged incidents." UMES intentionally violated the Notice provisions to ensure that [Plaintiff] could not appropriately respond to the fake allegations. [Plaintiff] requested the dates and times of the alleged incidents orally and in writing several times - on December 6th, in January, February 2025, and repeatedly since then by email. The OIE crooks refuse to provide dates and locations because it would expose their fake allegations."

135.    Plaintiff asserted that Defendants were required at a minimum to provides the dates, times, and locations of the conduct said to be harassment. Defendants failed to do this because they knew that there was not even one comment made to Roe after she commenced her job at UMES.

136.    Further, if Defendants added additional matters they were investigating beyond what was stated in the Notice of Allegations, they are required to provide a separate notice

with sufficient details about those allegations. Defendants did not meet this requirement and engaged in a fishing expedition which turned out to be futile but harmed Plaintiff's reputation by defaming him and showing him in false light.

137.     Plaintiff appealed that Defendants did not give him an opportunity to examine such evidence despite repeated requests. Not once did the Defendants show him any evidence.

Given that it was all electronic evidence, it was costless for the Defendants to provide it

for examination if it was genuine: "Clause (iv) also requires UMES to provide [Plaintiff]

with an opportunity to examine the relevant evidence - in this case the cell phone of [Roe]

which allegedly contains text messages. [Plaintiff] has requested access to this device to

expose the fake allegations and to show the doctored messages. Casares and gang have

simply refused to respond.

Given the repeated refusals, the deliberate concealment of information mandated to be

provided by the statute is fatal to this fake case."

138.     Plaintiff appealed that Defendants had violated mandatory investigatory processes: "106.46(f)(2) specifies that UMES must "provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence that are relevant and not otherwise impermissible." UMES violated this provision by deliberately hiding witnesses favorable to [Plaintiff] in its fake "Final Report" and refusing to collect evidence from honest witnesses who would have provided incontrovertible evidence that [Roe's] allegations are fake. Sub-clause 4 requires [Plaintiff] to be provided with an opportunity to access and examine the evidence. He requested this access on multiple occasions and asked for any evidence that exists to be sent to him by email. OIE crooks have not responded to these emails because any evidence they are claiming is fake and doctored. They are well aware that such doctored evidence would not withstand independent objective evaluation by a forensic expert."

139.     Plaintiff appealed that Defendants willfully refused to allow cross-examination of witnesses and complainant: "The statute mandates the questioning of witnesses and parties within both live-hearing and non-live hearing contexts. The statute mandates this "to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment." If live hearings are not adopted, the statute requires UMES to provide "each party with an audio

or audiovisual recording or transcript with enough time for the party to have a reasonable opportunity to propose follow-up questions." Despite repeated requests in writing, the OIE crooks have not provided an opportunity to cross-examine [Roe] or any audio or video transcript. This is a fatal and egregious violation that destroys this fake case against [Plaintiff]."

140.    Plaintiff submitted that Defendants made a credibility determination without affording him the opportunity to cross-examine Roe: "[Plaintiff] provided evidence that [Roe] had no credibility repeatedly. [Roe] submitted fake time sheets, was reprimanded for coming to work under the influence of drugs or alcohol, reprimanded for poor attendance and performance, and lied. She has zero credibility and her conduct subsequent to the alleged incidents destroys any implication that she experienced harassment. This would all have been exposed during cross-examination where she would have been required to explain the facts contrary to her fake claims. She would have been confronted directly about her lies with contradictory facts. [Roe's] credibility would have been destroyed and she would have been exposed as a liar and fraudster. It would have been conclusively established that she fabricated the allegations to fraudulently take federal funds and to escape deportation for violating immigration laws."

141.    Defendants' own policies required parties to be provided an opportunity for cross-examination. They violated this requirement.

142.    Regardless of whether they applied Title IX or the state of Maryland policy as the applicable legal regime, the due process protections accorded by the US Constitution including the right to cross-examine one's accuser, right to notice containing dates and times, clear establishment of jurisdiction to prosecute, etc., should have been provided to the Plaintiff. Defendants violated Plaintiff's due process rights.

143.    Plaintiff submitted that Defendants willfully ignored his requests for cross-examination "because their entire case rested on ...[a] fraudulent edifice. The critical need for cross-examination has been upheld in a number of judicial decisions. For instance, in *Doe v. University of Cincinnati*, Judge Barrett ruled, "where a disciplinary proceeding depends on a 'choice between believing an accuser and an accused ... cross-examination is not only beneficial, but essential to due process.'" Barrett concluded that cross-examination was an absolutely essential part of due process."

144.    Plaintiff cited *Doe v. Baum et al* (2018), where the court ruled that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." Plaintiff pointed out "the court's analysis is absolutely on-point here. [Roe] was receiving unlawful payments from Casares

under the guise of supportive measures. She was in Salisbury attending parties and entertaining men. It was absolutely costless to require her to attend cross-examination."

145.    Plaintiff quoted the *Baum* court's rationale and explained why the precedent applied: "[Roe] frequently attended work appearing intoxicated and cognitively impaired. She had no recollection for basic facts, dates, times, people, locations, etc. Her memory and intelligence were very much in question. Even more devastatingly for Casares and [Roe], both had ulterior motives for fabricating these fake allegations. Casares was the subject of complaints by [Plaintiff] and [Roe] feared being deported for violating immigration laws after being caught committing fraud.
As in *Baum*, these proceedings must be quashed."

146.    Plaintiff appealed that section 106(2)'s definition of hostile work environment was not satisfied: "Even reading [Roe] and Casares's fabricated allegations in the most favorable light and assuming everything to be true, the allegations do not satisfy the legal definition. As even Casares is forced to concede, they are not offensive, severe, or pervasive."

147.    Plaintiff appealed that the Final Report was full of lies and should be quashed: "OIE crooks' final report does not appear to have been written by a sane person. It is full of irrelevant drivel and riddled with lies about relevant matters. In page 3 et seq, the Final Report claims that [Plaintiff] did not participate in the proceedings. This is an absolute lie. [Plaintiff] attended meetings with the OIE crooks on 6th December and in January 2025. The OIE crooks were free to ask him any questions. They chose not to. [Plaintiff] submitted detailed written responses in conjunction with his then legal counsel categorically rejecting and debunking the fake allegations. It was conclusively shown that the allegations were fabricated, there was no evidence, and even taken at face value, the comments would not constitute harassment. [Plaintiff] also testified that Casares and crooks were undertaking a witch-hunt in retaliation for exposing criminal activity by Heidi Anderson."

148.    Plaintiff attacked Defendants' circular reasoning and illogical opinions dressed up as "findings of fact." He wrote "The OIE crooks present various conjectures and gibberish dressed up as findings of fact. A person of elementary intelligence and reasoning ability can read those so-called "findings" and discern that they are nothing but the OIE crooks' opinions. There is nothing even remotely factual and the opinions are unsupported by any evidence."

149.    Plaintiff appealed that he had not been provided with any evidence and Defendants' claims contradicted their findings: "OIE crooks purport to show screenshots that have been doctored. There is no date or timestamp on these supposed screenshots that appear to be manufactured by Photoshop. The reliance on these doctored images is an absolute violation of the rules relating to evidence in Title IX. [Plaintiff] requested access to the cellphone to

expose doctoring but OIE crooks have not responded to this request to date. The doctoring and false conclusions being drawn by the OIE crooks is exposed as the lie it is by [Roe's] own statement on page 12: [Plaintiff] appeared "very friendly [towards her] at first," and she felt that she had to be friendly as well, despite her reservations." Roe stated that [Plaintiff] was distant toward her from the moment she arrived at UMES. This absolutely destroys any claim about harassment or inappropriate interest in [Roe]."

150.     Plaintiff again asserted that he had never met Roe alone: "There are eye-witnesses that OIE was notified about that can verify these facts. As another example of OIE crooks' intentional illegal activities, Casares and minions did not contact these witnesses even once. And they deliberately hid witnesses who provided exculpatory evidence. Illogically and bereft of even the thinnest reasoning capacity akin to a retard, OIE claims to determine that [Plaintiff] sent text messages containing "personal inquiries and jokes." No corroboration, no actual evidence, no credibility. Just an opinion as part of a pretextual witch hunt."

151.     Plaintiff attacked the supposed screenshots for not containing any dates or times: "OIE purports to show doctored screenshots without any dates or timestamps of [Plaintiff] asking for "pics." Note that there is no suggestion that the pics were inappropriate in any form. For instance, even the doctored screenshots do not ask for inappropriate pics. If as is likely, this exchange was made before [Roe] was an applicant for a position at UMES, why did she apply for a position at UMES? If she felt harassed by the messages, why did she seek to come and work with [Plaintiff]? Why did she relocate to a different state if she was harassed? The lowly entry-level position was not such a lottery that would necessitate relocation to the location of alleged harassment. The amount of effort to apply, relocate, move to UMES is completely contradictory of any harassment of Roe. The fact is Roe wanted to steal money and not do any actual work. She manufactured these fake accusations after being caught and because she feared deportation for violating immigration laws."

152.     Plaintiff submitted the "only doctored screenshots provided with dates expose the allegations as fake. The first instance of screenshots showing any dates are contained on page 13. The date is shown as August 8, 2024. The message shows emojis sent by [Roe] laughing hysterically. This response by [Roe] conclusively debunks any claim that she was harassed or experienced any discrimination from any messages sent prior. In addition, the date of August 8th is extremely significant. It was well before [Roe] commenced employment at UMES, relocated out of state to Maryland from [...], and before she completed any paperwork for employment. If [Roe] was harassed by messages sent prior to August 8th, why did she apply for the job to work with [Plaintiff]? Why did she relocate to Maryland for a mere 6-month contractual position? Why did she undertake the difficult task of securing temporary housing for a mere 6-month contractual position? Why did she undertake the laborious paperwork required for UMES employment. The other screenshots with dates of August 13, and 17th also debunk any claim of harassment. They show friendly

exchanges and meetings. Not once did [Roe] express any reservations about the alleged communications. There is not a shred of evidence that she objected to the humor or tone of the communications or indicate that they were anything but in jest.

In fact, the August 17th screenshot is devastating to the OIE crooks. In the purported message is a request from [Roe] for a meeting to "discuss something" to which [Plaintiff] politely offered a time. Funnily and devastatingly for OIE and [Roe] there is not a single message after this date."

Recall that Roe commenced employment on August 19th. Not one screenshot after that date.

153.    Plaintiff challenged the Defendants' findings as absurd and illogical: "If [Roe] felt harassed on August 17th, why did she wait until December to file a complaint? Why did she wait until she was caught submitting false timesheets and coming to work impaired? Why are the OIE crooks or [Roe] unable to produce a single message after the date on which [Roe] started working at UMES - late August 2024 - which even remotely suggests harassment?"

154.    Plaintiff challenged Casares's "finding" without a shred of evidence that Plaintiff invited Roe to meet him in Washington DC. Apparently, this occurred before Roe was employed at UMES and before she was even an applicant. There is nothing provided to substantiate this accusation beyond Casares and Roe's fantasies: "Casares makes a conclusion without any evidence that [Roe] was invited to go to DC. He is unable to doctor any messages but still makes such a determination based just allegedly on Roe's statement. Roe has no credibility and is frequently confused about basic facts and is a fraudster. No such conclusion can be made. Even assuming for the sake of argument that Roe was invited to a meeting in DC prior to her commencing employment at UMES, Casares's unsupported and completely illogical suggestion that there is anything inappropriate about a meeting in DC needs to be quashed. Based on the evidence of actual meetings between [Roe] and [Plaintiff], the latter never met [Roe] alone and was never within 6-feet distance of her. Casares's manufactured innuendo about both the existence of any invitation and anything inappropriate about a meeting in DC, must be seen in the light of his well-documented

40

record of abusing Title IX processes and investigations for nefarious activities. If every

meeting between two individuals in Washington DC were to be deemed inappropriate, this

country's courts would be full of lawsuits and judges would have time for little else. So,

Casares's perverted imagination and fantasies should be quashed with prejudice.

155.    Plaintiff challenged Defendants' "finding" that Plaintiff invited Roe to lunch
without any evidence. Plaintiff "never invited [Roe] to a meal of any sort. As [Roe] herself
admitted in the Final Report, [Plaintiff] rarely interacted with her, avoided her, and was
distant. Casares also make up a lie that [Plaintiff] did not invite the Indian male employee
to a meal. This is absolutely false. The Indian male employee - Dr D - was invited and
attended lunch with [Plaintiff] on two separate occasions with the following witnesses
being present (names omitted)."

156.    Defendant Casares also makes up another strange claim shorn of any logic or

evidence: "[Plaintiff's] conduct and actions were deemed to be based on the two staff

members' gender and national origin. For the Complainant, in particular, having

knowledge of this comparable treatment ... The overall adverse impact was significant for

[Roe] to the point where it ultimately affected her health, and her work productivity." In

fact, this above statement is so disconnected from the paragraphs that precede it that one

must wonder if it was actually written by a sane person." Defendants also confused national

origin with ethnicity.

157.    Defendants' entire adverse action rests on their finding under the vague, overbroad,

and unconstitutional State of Maryland Policy on Sexual Harassment. Violating every due

process requirement and despite their own admission that the actions were not "severe or

pervasive" Defendants imposed a cruel and unjust sanction based on a pre-empted and

unconstitutional state law. They knew that if they applied the correct law – Title IX – their

goose was cooked.

158.     Plaintiff appealed the Defendants conclusions as illogical and biased: "totality of
the circumstances in this matter is sufficient to establish that [Plaintiff] engaged in a course
of conduct constituted unequal treatment based on national origin and gender, which
amounted to harassment and a hostile work environment in violation of the UMES Policy
Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy, adopted
by UMES" (page 24).

The "totality of circumstances" shows exactly the contrary. It shows that [Roe] has no
credibility, made up false accusations that not even the OIE crooks could prop-up, was
caught submitting fraudulent timesheets and coming to work under the influence of alcohol
or drugs, and performed poorly at work. The totality of circumstances shows OIE staff
manufacturing lies, blatantly violating the law, and engaging in disgusting practices that
expose UMES to massive liability. It also shows that this was a scam of a witch hunt
organized by a criminal gang in retaliation for a complaint against Heidi Anderson and her
gang."

159.     Plaintiff appealed on the ground that the Supremacy Clause of the US Constitution
mandated the application of Title IX to this case. Plaintiff submitted: "based on a plain
reading of Article VI clause 2, Title IX preempts the Maryland Sexual Harassment policy
and UMES policies that are in conflict. There is absolutely not even a shred of opportunity
to argue this point because Congress explicitly stated such preemption in the plain wording
of Title IX as noted previously in this appeal. As that quoted language notes, universities
receiving federal financial assistance must apply Title IX provisions in these cases."

160.     Plaintiff appealed that the "congressional intent to preempt any conflicting state
law is expressly stated in the Explanatory Memorandum issued by the US Department of
Education which is the implementing agency. That memorandum notes that sexual

harassment allegations are substantially different in the educational context that other workplaces because of the implications of constitutional requirements such as the First Amendment, the use of federal funds, etc. It explains the deliberate legal protections including specific mandatory definitions of sexual harassment, the process to be followed, due process obligations, cross-examination requirements, and the need to ensure that innocent persons are not wrongly accused and punished."

161.    Plaintiff pointed out that the implementing agency for Title IX – the Department of Education – explained why universities are different: "the Explanatory Memo states: "an institution of higher education differs from the workplace. In this regard, these final regulations are consistent with the sense of Congress in the Higher Education Act of 1965, as amended, that "an institution of higher education should facilitate the free and open exchange of ideas." The sense of Congress is that institutions of higher education should facilitate the free and robust exchange of ideas, but such an exchange may prove disruptive, undesirable, or impermissible in the workplace."

162.    Plaintiff argued that Title IX's applicability is unambiguous based on the US Department of Education's published guidance available to UMES: "the Department believes that these final regulations create clear legal obligations that facilitate the Department's robust enforcement of a recipient's Title IX responsibilities. The mandatory obligations imposed on recipients under these final regulations share the same aim as the Department's guidance."

163.    Plaintiff submitted that Defendants' investigation must be quashed because it applied the wrong legal standard: "OIE's failure to apply the correct legal standard, and the willful application of the wrong, preempted state law standard vitiate this fake investigation." Even if the state law had been applied, Title IX's procedural protections including cross-examination must have been provided to Plaintiff. He argued, "[a]pplying either standard, the totality of circumstances exposes this to be a fake, pretextual witch hunt with innumerable violations of the US Constitution, statutory rights, and the Maryland Declaration of Rights. The application of the wrong legal standard is an immediate and unarguable ground for quashing these proceedings. Fictitious and illogical statements at pages 24-26 must be quashed with prejudice. They are mere opinions dressed up as findings and are completely unsupported by even a pretense of evidence."

164.     Plaintiff's appeal submission also contained a complaint that UMES violated his Title IX and Title VII rights because it was discrimination on the basis of gender.

165.     Plaintiff appealed that "Casares and gang just make up statements attributed to [Roe] and assume them to be true. There is not even a shred of evidence to support these statements. [Roe] has been spotted partying and consuming drinks and alcohol in November and December and entertaining random men. This contradicts any claim or stress or anxiety from anything falsely alleged to have been done by [Plaintiff]. As she admits, she was on medication even before commencing UMES employment suggesting that there is no causal relationship between anything done by [Plaintiff] and her supposed anxiety. It is more likely that she is delusional or hallucinating as indicated by apparent confusion and disorientation from day-one of her employment at UMES."

166.     Plaintiff appealed the Defendants' "findings" as biased noting that failure to treat him equitably as mandated by statute and the disproportionately favorable treatment of Roe. Despite knowing that Plaintiff worked about half a mile away from Roe and that he never met her alone, Plaintiff was banned from campus. In total violation of her student visa, Roe was allowed to go on leave and be paid for over 8 months doing no work. Plaintiff's repeated pleas for the dates of any comments made received no response because Defendants knew their fake case would collapse because there was not a single comment they could evidence after Roe started working.

167.     Plaintiff argued that instances of bias were challenged repeatedly in writing to Defendants. However, Defendants did not respond even once and just engaged in evasion. Defendants did not even produce one facially plausible explanation for their biased actions - because none exists.

44

168.    Plaintiff pointed out specific provisions pertaining to supportive measures were violated by Defendants. These were mandatory and the violations were willful. Plaintiff had challenged his placement on administrative leave and ban from campus as legally unsupported and practically unnecessary given the minimal contact with Roe. Defendants had simply ignored these challenges and provided no legally sufficient justification.

169.    Plaintiff argued that Defendants violated the presumption of innocence: "Section 106.45 (b)(3) mandates a "presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures." The factual record shows a number of individuals connected to the Casares OIE crooked gang telling campus community members that "[Plaintiff] has been removed," "he is never coming back", terminating his research illegally, displaying his photograph in a public area of the campus police department, etc."

170.    Plaintiff appealed that Defendants intentionally concealed exculpatory evidence by lying about the witnesses interviewed who had clearly provided exculpatory evidence. Defendants also intentionally refused to interview other witnesses who had direct, first-hand information that the accusations were false.

171.    Plaintiff's appeal memorandum stated, Section 106.45 (b)(6) mandates an "objective evaluation" of "all evidence that is relevant, as defined in § 106.2, and not otherwise impermissible under paragraph (b)(7) of this section—including both inculpatory and exculpatory evidence." Here, Casares and gang's Final Report lists the witnesses they claimed to have interviewed. There is no mention of the fact that they interviewed a full professor and three students who provided testimony that is fatal to this fake case. Despite Casares's fantasy, the hiding of these names is not going to make their testimony go away. Their sworn affidavits have been provided to the Office of Attorney General, and the University System of Maryland. A signed statement by six Iranian

45

students contradicting [Roe's] fake allegations has also been provided. In addition, [Plaintiff's then counsel] notified OIE in December 2024 that the allegations have absolutely no merit and that all interactions between [Plaintiff and Roe] were witnessed by [Professor X]. Despite this clear communication, the OIE crooks make no attempt to contact [Professor X]."

172.    Plaintiff submitted that Defendants had interviewed two witnesses with known animus towards him. These two witnesses had nothing to do with the complaint, did not have any known interactions with Roe, and were purely interviewed as part of the witch hunt to drum up anything negative. Despite their best attempts, Defendants failed to produce anything of substance from these biased witnesses.

173.    Plaintiff appealed the sanction imposed especially after Defendants' own admission that Plaintiff did not do anything "severe or pervasive." Despite this "finding", Defendants imposed a sanction of demotion to a position paying half of what Plaintiff currently earned. He asserted the punishment was grossly disproportionate, and violated the constitutional norm against cruel and unjust punishment.

174.    Plaintiff stated that he would submit case law and legal analysis on the unjust punishment issue after Defendants identified the appeal authority to whom he could make the submission.

175.    Defendants did not respond and did not provide Plaintiff this opportunity. It would have been costless, there was plenty of time, and Defendants would not have suffered any harm.

176.    Defendants did not provide an opportunity to provide legal analysis because they knew the punishment was grossly unjust. They just evaded Plaintiff's pleas in their haste to reach their predetermined outcome for unlawful retaliatory purposes.

177.    Plaintiff concluded by asserting that "OIE has exposed itself to be a criminal gang that is so gravely violating the law that harsh legal action must follow. The appeal authority is requested to dismiss the case against [Plaintiff] with prejudice, commence proceedings against [Roe], Casares, Ginta Martin and Rivera, and tender an unconditional apology on behalf of UMES."

178.    There was total silence from Defendants after this appeal submission and there was no decision within the timeframe stipulated in the Defendants' policies.

179.    Defendants did not identify the appeal authority, as they were required to do, and as requested by Plaintiff for the submission of confidential documents under seal.

180.    On June 24, Plaintiff emailed Matthew Taylor with copies of the appeal submission and the legal memo from previous counsel sent on January 24, 2025: "Hi Matt,
"I am sending you the attached as a professional courtesy and to eliminate any pretense of lack of knowledge. It is difficult to believe any attorney would participate in such egregious illegal activity.
I am sure you are familiar with Rules 3.3 and 4.1 of the ABA Model Rules. It is not worth jeopardizing your law license and livelihood for these criminals. These illegal actions are indefensible and will be humiliating in court.
Please consider carefully and act within the confines of the law. The recent harsh punishments against attorneys Rudy Giuliani, Jenna Ellis, John Eastman, etc., should give you pause for thought.
If you are being coerced, please submit a complaint to the DoJ and the US Dept of Education.
Thank you."

181.    It is apparent that Defendants' house of cards had collapsed and they could not respond to the factual and legal challenges showing that their actions were unlawful.

182.    Abruptly, on July 25th, Defendant Ginta Martin emailed Plaintiff a "Final Appeal Decision" issued by the appeal authority, Rondall Allen.

47

183.    Recall that this is the same Rondall Allen against whom Plaintiff had filed complaints about criminal activities including theft, embezzlement, etc., prior to the commencement of this fake investigation.

184.    A reasonable person would have recused himself because of the clear conflict of interest and the appearance of bias. However, Rondall Allen did not and apparently wrote the final appeal decision.

185.    Based on direct observation of his work for over two years, Rondall Allen struggles to write a coherent paragraph. He uses ChatGPT for any writing tasks because he is simply incapable of any intellectually demanding work.

186.    Aside from the conflict of interest and bias, Rondall Allen should not have been the appeal authority due to sheer incompetence. If he did not know this, Defendants and their legal counsel did and should not have placed him in such a position.

187.    Then it should come as no surprise that the appeal decision is absolute gibberish.

188.    The appeal authority either did not read or could not comprehend the appeal arguments.

189.    The appeal authority simply evaded the appeal grounds and just recited what was in the Defendants' report in a short peremptory response to a detailed appeal memorandum. There was absolutely no reasoning or logic.

190.    Under the Defendants' policies, Roe has to be provided the Plaintiff's appeal submission, and she is required to provide a response within 5 days.

191.    The appeal authority is required to be neutral and impartial and adjudicate the competing claims without bias.

192.    There is no evidence showing that Roe was provided with the Plaintiff's appeal submission or what her response was. No arguments are attributed to her. It is likely that

nothing meaningful was provided or received because Roe was just a stooge for Defendants' unlawful scheme to retaliate against Plaintiff.

193.     Rondall Allen does not seem to understand preemption, the supremacy clause, mandatory legal rules, that one cannot cherry pick rules based on taste, etc. He seems to be under the impression that one can just pick and choose legal rules based on convenience.

194.     Rondall Allen did not cite the standard of review for the appeal nor does he seem to understand what that concept is. He seems thoroughly confused and all at sea.

195.     Incredibly, Rondall Allen claimed to have spoken to OIE Defendants *Ex Parte* to know why Title IX does not apply. He swallowed wholesale their statement that Title IX does not apply without an iota of critical thinking or checking if they are right. He did not consult the General Counsel or seek input from Plaintiff. There is not even one line of reasoning explaining why Title IX does not apply.

196.     Defendants would have known and ought to have known of the 4th Circuit's controlling law that cross-examination is an essential part of due process in such proceedings. Plaintiff was denied this right despite repeated requests, and this was highlighted in the Appeal. Rondall Allen did not address this point at all.

197.     Rondall Allen does not appear to comprehend the need to consider exculpatory evidence and how not doing so is reversible error. He did not even mention once the repeated ignoring of witnesses who had exculpatory evidence and the lies in the witness list mentioned in the Final Report which hid witnesses who had provided such testimonies.

198.     Rondall Allen does not seem to understand the meaning of bias and makes conclusory assertions that there was no bias without responding to the specific points showing bias.

199.     Rondall Allen's decision is an absolute embarrassment to the Defendants and only underscores the pretextual nature of the witch hunt. It will be attached as an Exhibit and Plaintiff will not waste this District Court's time in a point-by-point rebuttal.

200.     ; - On July 27, 2025, Defendant Heidi Anderson gleefully wrote to Plaintiff informing him that he has been demoted to a position paying less than half of his current salary with immediate effect. Given that Anderson is the leader of this gang and sought this outcome all along, this comes as no surprise and the haste only highlights pre-determination.

201.     As a result of Defendants' intentional and malicious unlawful actions, Plaintiff has and continues to suffer immense damages.

202.     His salary has been halved, and he has been demoted.

203.     Plaintiff's reputation has been irreversibly harmed, and he has been labeled an abuser without a sliver of justification.

204.     As a result of Defendants' unlawful actions, Plaintiff has been banned from campus and shunned by some colleagues who are afraid of antagonizing the criminal gang running the university.

## IV. STATEMENT OF CLAIMS

### COUNT 1: Intentional Violation of 42 U.S.C. § 1983-Denial of Fourteenth Amendment Due Process and Conspiracy

205.     Plaintiff incorporates the allegations in the paragraphs above herein and realleges them as if fully set forth again below.

206.    The Fourteenth Amendment to the US Constitution states that no state shall "deprive any person of life, liberty, or property, without due process of law."

207.    Defendant UMES is a public university, and it exists solely because of the Title IV and Title III funds it receives from the US federal government. It receives only a trivial amount of private tuition income and would be bankrupt without federal funds. UMES and the individual Defendants are subject to the requirements of the Constitution.

208.    The serious property interest in Plaintiff's tenured employment merits the provision of due process protections by the Defendents including by way of proper notice of charges showing dates and locations of any alleged misconduct, an opportunity to examine and rebut evidence, an opportunity to cross-examine an accuser, hearing by an impartial fact finder, and have exculpatory witnesses be heard. *Doe v. Baum*, 2018 WL 4265634, at **3-5 (6th Cir. Sept. 7, 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

209.    Plaintiff had a property interest in his current job role that could not be deprived without due process of law.

210.    Plaintiff has a liberty interest in his good name, reputation, honor, and integrity which cannot be deprived without due process.

211.    It is well established that a person has a liberty interest in employment opportunities, career advancement, doing research, and occupational freedom – all of which were violated by the Defendants.

212.    Plaintiff has a right to be free from arbitrary demotion derived from UMES and USM policies and rules and state laws in addition to his contract.

213.    Individual Defendants conspired to deprive Plaintiff of his due process rights to achieve a predetermined outcome in retaliation of the complaints he had filed against them.

214.    Defendants violated Plaintiff's due process rights by failing to give him sufficient notice stating dates and times, failing to establish jurisdiction to process a complaint based on accusations before Roe was associated with UMES, failing to allow Plaintiff to examine evidence, failing to provide cross-examination of complainant and witnesses, deliberately ignoring exculpatory evidence, violating their own policies' timelines, failing to apply the correct legal standard, failing to apply the correct standard of review to the appeal, failing to be equitable in awarding supportive measures, failing to follow the rules allowing Plaintiff to contest supportive measures, failing to follow conflict of interest rules, failing to refrain from bias, failing to observe controlling US Supreme Court and 4th Circuit case law.

215.    Defendants acted in furtherance of the conspiracy after forming an agreement to retaliate because of Plaintiff's complaint against their crimes. This was shown by Heidi Anderson's statement that she knew "from the pattern of words and phrases" who filed the complaint and Rondall Allen's hostile acts after the Plaintiff filed his complaints about their theft of federal funds.

216.    Alexandra Ginta Martin, Matthew Taylor, Jason Casares, and Cecilia Rivera conspired and acted to ignore demands for due process including applying the correct legal standards, withholding exculpatory witnesses, intimidating witnesses, coercing witnesses, defaming Plaintiff, falsely conveying that Plaintiff had been fired, concealing evidence, refusing to provide sufficient notice with dates, times, and locations of alleged misconduct, conducting an investigation into matters over which they had no jurisdiction because complainant Roe was a stranger to the university at that time, manipulating and doctoring evidence to convey a false narrative, adding extraneous and irrelevant matters to muddy

the waters, deliberately claiming to make "findings of fact" when there were neither "finding" nor "facts" but just gibberish, and making illogical unlawful claims.

217.    Alexandra Ginta Martin, Matthew Taylor, Cecilia Rivera, Jason Casares, and Heidi Anderson acted in furtherance of the conspiracy by unlawfully nominating Rondall Allen as the appeal authority when they knew that he had a conflict of interest and was biased.

218.    Matthew Taylor acted in furtherance of the conspiracy by deliberately communicating false legal advice, ignoring US Constitutional standards, mandatory statutes, and failing to adhere to controlling judicial precedents.

219.    42 USC Section 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

220.    Individual Defendants acted under the color of law to violate Plaintiff's due process rights.

221.    Individual Defendants acted with actual malice and intent because they had an ulterior motive: punishing Plaintiff for complaining against them.

222.    Defendants acted with malicious motives in furtherance of the conspiracy as Plaintiff continued to highlight their illegal actions during the investigation including to the USM Board of Regents and the Attorney General's Office.

223.    Individual Defendants knew that they were acting in violation of the law. Each of the Defendants has received training in Title IX and related policies and is aware of the legal responsibilities. There is no grey area or ambiguity. They had Matthew Taylor readily

available if needed to remove any ambiguity. Plaintiff repeatedly made submissions about Defendants' legal obligations citing authorities but was ignored because Defendants wanted to violate the law.

224.    Defendants are not entitled to any kind of immunity.

225.    Defendants' intentional actions in violation of the laws were in furtherance of a conspiracy against Plaintiff and included refusing to follow notice requirements for dates and times, jurisdictional rules, examination of evidence, equitable treatment, cross-examination opportunities, applying the correct legal standards, using exculpatory evidence that was provided as early as the week after the initial meeting on December 6, 2024, fair appeal procedures, and disproportionate punishment.

226.    Plaintiff suffered serious and pervasive economic and emotional damages as a result of Defendants' unlawful actions.

227.    Plaintiff is entitled to reinstatement to his original position and declaratory and injunctive relief.

## COUNT 2: Violation of 20 U.S.C. § 1681 et seq.-Title IX

228.    Plaintiff incorporates all the allegations in paragraphs above herein as if they were realleged and fully set forth again.

229.    On February 4, 2025, the US Department of Education issued a Dear Colleague Letter to US universities stating "the binding regulatory framework for Title IX enforcement includes the principles and provisions of the 2020 Title IX Rule and the longstanding Title IX regulations outlined in 34 C.F.R. 106 et seq., but excludes the vacated 2024 Title IX Rule. Accordingly, open Title IX investigations initiated under the 2024 Title

IX Rule should be immediately reevaluated to ensure consistency with the requirements of the 2020 Title IX Rule and the preexisting regulations at 34 C.F.R. 106 et seq."

230.     Defendants' fake investigation, which was started under the 2024 Title IX was squarely covered under this DCL and Defendants were bound to follow the 2020 Title IX Rules.

231.     The DCL was read by individual Defendants and there is no opportunity to claim ignorance.

232.     Defendants panicked because their house of cards was about to collapse. They could not satisfy the requirements of the 2020 Rules and chose evasion instead of compliance, thereby intentionally engaging in unlawful activity.

233.     20 USC Section 1681 provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

234.     The statute is enforceable through an implied private right of action. See *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

235.     Title IX applies to all institutions receiving federal funds via Title IV and as noted above, UMES is wholly dependent upon federal funds for its diurnal survival. Title IX applies to UMES, and it is required to certify compliance to the US Department of Education.

236.     As detailed above, Defendants violated Title IX when it was clearly the mandatory legal regime governing this case, by failing to follow the February 4, 2025, DCL, failing to follow mandatory rules prescribed by Title IX, and arriving at an erroneous outcome against the Plaintiff.

237.    Defendants' intentional failure to adhere to Title IX was due to retaliatory animus and gender and racial bias against Plaintiff.

238.    Defendants misapplied, failed to apply, or violated its own policies with a discriminatory intent against Plaintiff thereby violating Title IX.

239.    Defendants never once provided any plausible rationale for refusing to follow Title IX despite numerous requests.

240.    Defendants conducted their sham investigation in way calculated to achieve their erroneous outcome to harm Plaintiff including by intimidating witnesses, excluding exculpatory witnesses, manipulating and doctoring evidence, bribing the complainant, exhibiting bias, failing to apply the correct legal standards, claiming their opinions are "facts", denying notice, denying cross-examination, denying any opportunity to examine evidence, failing to uphold the presumption of innocence, and orchestrating a fake appeal process.

241.    Defendants deliberately failed to follow witness testimony from Professor X as that would have destroyed Roe's claims. Defendants did this because they knew the whole complaint and investigation was a fraud.

242.    The difference in evidence collection, treatment, credibility alone highlights discriminatory treatment. Roe's words are swallowed wholesale as the truth whereas the Plaintiff's clear and convincing statements that he has never met Roe alone, that she had an ulterior motive, that he has never acted inappropriately, and the statements by 8 student witnesses that Plaintiff acted respectfully was ignored.

243.    The difference and inequitable treatment in relation to supportive measures shows discrimination. Roe was given leave and paid in violation of the immigration laws whereas Plaintiff was banned and excluded without any practical or legal justification.

244.　　The appeal authority had an ulterior motive and discriminated against Plaintiff.

245.　　Defendants were motivated by a desire to smear the Plaintiff to escape prosecution for their criminal activities.

246.　　Defendants' actions caused severe and pervasive harm to Plaintiff that is capable of redressal by declaratory and injunctive relief and an award of damages.

**Count 3: Violation of First Amendment – Freedom of Speech and Conspiracy 42 USC 1983**

247.　　Plaintiff incorporates all the allegations in paragraphs hereinabove as if they were realleged and stated again fully for this count.

248.　　Plaintiff had a constitutionally protected right under the First Amendment to freedom of speech and expression. Plaintiff's complaints against individual defendants engaging in criminal activities are protected by the First Amendment. Defendants' retaliatory actions and demotion of Plaintiff to a lower paid position violate the right to freedom of speech.

249.　　Defendants started this fake investigation to signal to others that complaining against them would entail vicious retaliation.

250.　　Defendants' actions are aimed at chilling speech and expression.

251.　　Defendants violated Plaintiff's constitutionally protected speech and association rights by illegally barring him from campus, fabricating an investigation to chill his speech, and by demoting him to a lower position.

252.　　Defendants were aware that their actions are unlawful and do not merit qualified immunity.

253.     Defendants' unlawful actions caused Plaintiff severe and pervasive harm and is capable of redress through declaratory and injunctive relief and reinstatement to his previous position.

## COUNT 4: Negligent Hiring, Supervision, and Retention

254.     Plaintiff incorporates all the allegations in paragraphs above as if they were fully realleged again.

255.     Defendant 7 owes a duty of care to Plaintiff to use care in hiring, supervision, and retention of its personnel including all the individual defendants.

256.     Defendant 3 has a well-publicized public record as an alleged rapist. Publicly available media reports also show that he has been accused of abusing investigatory processes and rules at his previous places of employment.

257.     Defendant 3 has been a named defendant in lawsuits in several states where he has worked for abusing investigations and violating rights.

258.     Defendant 3 should never have been hired and promoted as the Title IX Director and paid a disproportionately high salary by Defendant 1 and 7.

259.     Defendant 1 intentionally and maliciously promoted and paid exorbitant salaries and benefits to Jason Casares as a bribe for engaging in illegal activities on her behalf.

260.     It was entirely foreseeable that employing Jason Casares would result in biased Title IX investigations, lawsuits, discrimination complaints, and serious violations.

261.     Defendant 1 employed gang-recruitment tactics in selecting a person of manifest and documented illegal activities and who she knew was unemployable at any other university precisely because of his faults.

262.     Defendant 1 was at all times Jason Casares' supervisor. She had actual knowledge of his unlawful actions at UMES because she was given numerous complaints against him.

263.     Defendant 1 deliberately and maliciously failed to properly train and supervise Jason Casares because she wanted to employ him for unlawful purposes including by concocting fake cases and investigations against honest employees, suppressing complaints against her and associates, and weaponizing Title IX for unlawful purposes.

264.     Defendant 1 did not possess the qualifications, experience, or character to be appointed president of UMES. She was appointed solely because she was an unctuous toady of USM Chancellor Jay Perman. Numerous complaints against her by senior administrators, alumni, students, faculty, and staff were covered up. Defendant 7 did not train her or supervise her appropriately.

265.     Defendant 2 had no qualifications to be appointed Provost. He did not possess the intellectual ability, competency, or experience necessary for such a position. Defendant 2 should never have been an appeal authority because his intellectual and cognitive deficits meant he could not understand and apply necessary rules and policies. Defendant 2 was not trained or supervised properly.

266.     Defendants 3, 4, 5, and 6 were paid grossly exorbitant salaries as bribes for engaging in unlawful acts on behalf of Defendants 1 and 2. They should never have been hired for or retained in their positions. Defendant 7 was grossly negligent and recklessly indifferent to their unlawful activities.

267.     Defendant UMES's improper hiring, failure to supervise, and train the individual Defendants violated their duty of care and caused severe economic, reputational, and emotional harm to Plaintiff.

268.     The court can provide redress by ordering the commencement of discipline and termination proceedings against individual defendants for malicious unlawful activities and can award money damages in an amount determined at trial.

## COUNT 5: The Maryland State Policy on Sexual Harassment Violates the First Amendment, is Unconstitutionally Vague and Overbroad, and must be struck down.

269.     After Defendants realized that their gig was up if they followed the mandatory federal law applicable in this case, Title IX, they adopted a ruse by seeking to apply the Maryland State Policy on Sexual Harassment.

270.     This law, adopted in 2022, drastically departs from federal law and drops the "severe and pervasive" standard. It is a content-based restriction on speech that violates the First Amendment to the US Constitution.

271.     The Maryland law is unconstitutionally vague and overbroad.

272.     Article 20 610(a) of SB 450 defines "sexual harassment" in vague and overbroad terms to include unwelcome and offensive conduct, which **need not** be severe or pervasive, when the conduct is based on a protected class, and:

1. Submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;
2. Submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or
3. The conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile, considering the totality of the circumstances.

273.     The Maryland policy reaches constitutionally protected speech that is merely offensive or unwelcome to some listeners. This upends the long-established judicial precedent and Congressional intent to only punish severe and pervasive offensive conduct.

274.     The Maryland policy is overbroad by sweeping up any kind of speech content that a listener deems offensive or unwelcome thereby eliminating jokes, casual statements, or banal remarks that are neither severe nor pervasive. It does not define prohibited conduct, offers no procedural protections, and is facially unconstitutional.

275.     Notwithstanding the Maryland legislature's desire to promote harmony in the workplace, it cannot be at the expense of the First Amendment to the US Constitution.

276.     It is well settled that the government cannot prohibit speech merely on the grounds that it is "offensive" or "unwelcome" to some listeners. Speech cannot be abrogated merely because it would cause discomfort to a hyper-sensitive listener such as Roe.

277.     Plaintiff has standing to bring this constitutional challenge because he was directly harmed by the enforcement of the Maryland law. He was demoted after a farcical investigation based on this law, deprived of procedural and substantive due process, and deemed responsible based on vague and overbroad conclusions under the color of this law.

278.     Here, Defendants cited alleged comments by Plaintiff "that he thinks Persian women are beautiful" as constituting sexual harassment under the Maryland policy illustrating its unconstitutional vagueness and overbreadth. The statement is protected speech under the First Amendment.

279.     There is no evidence that the complainant against Plaintiff was Persian and none was presented. Not all Iranians are Persians. Iran is a multi-ethnic country where Persians constitute a segment of the population. A statement that Persian women are beautiful cannot be unwelcome or offensive – it is pure opinion and constitutionally protected speech. Ditto the other statements attributed to the Plaintiff: all are harmless, trivial, and not offensive.

280.     Plaintiff had no knowledge actual or implied that complainant Roe was Persian.

281.      Defendants produced no evidence of Roe's Persian ethnicity or evidence that Plaintiff had knowledge of it.

282.      Plaintiff had a free speech right to make the alleged comment; it had no sexual animus, and no offensive content.

283.      Plaintiff repeatedly asserted that his comments were not harassing, had no interest in Roe, that she never objected to any comment, that she responded with smiling emojis, that the comments were made prior to her employment or even making an application for employment, and she never asked Plaintiff to cease making any comment.

284.      Defendants themselves reluctantly admitted that Plaintiff's conduct was not "severe or pervasive."

285.      Notwithstanding these conclusive pieces of evidence, Defendants used the overbroad and vague state law to make a finding against Plaintiff.

286.      The plaintiff suffered an individual injury from the unconstitutional Maryland law.

287.      The Maryland law's vagueness and overbreadth enables substantial violations of the First Amendment and due process rights by public officials.

288.      In *DeJohn v. Temple University*, 537 F.3d 301, 320 (3d Cir. 2008), the 3rd Circuit Court of Appeals analyzed binding Supreme Court precedents and opined: "since the inception of overbreadth jurisprudence, the Supreme Court has recognized its prominent role in preventing a "chilling effect" on protected expression.  Broadrick v. Oklahoma, 413 U.S. 601, 630, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ( "Although the Court declines to hold the Oklahoma Act unconstitutional on its face, it does expressly recognize that overbreadth review is a necessary means of preventing a 'chilling effect' on protected expression.").   This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the

lifeblood of academic freedom.    As the Supreme Court in *Healy v. James* explained, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." The court's analysis resulted in its finding that the sexual harassment policy was unconstitutionally overbroad.

289.   The Maryland law abrogates procedural protections and confers untrammeled and arbitrary powers to public officials, as in this case, to run kangaroo courts to stifle speech.

290.   In the hands of rogue public officials such as Defendants, any statements can be twisted to meet the Maryland law's definition of harassment based on the vague and overbroad "totality of circumstances" phrase. It can mean anything that a public official wants it to mean.

291.   The Maryland law will have a chilling effect on protected speech under the Constitution, especially in a university environment where there is supposed to be an environment of open communication and free exchange of ideas. As the Supreme Court has held, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]." *Healy v. James*, 408 US 169, 180 (1972). In *Rust v. Sullivan*, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Supreme Court "recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." In Rust, the Supreme Court noted that the "existence of a Government "subsidy," in the form of Government-owned property, does not justify the restriction of

speech in areas that have "been traditionally open to the public for expressive activity," citing *United States v. Kokinda*, 497 US 720 (1990).

292.    The government has no compelling interest that outweighs the Plaintiff's speech rights in such a context.

293.    The plaintiff's injury is capable of being corrected by this court striking down the Maryland law as unconstitutional.

294.    It is prayed that this court will permanently enjoin Defendants and the State of Maryland from enforcing this statute and quash all findings and sanctions imposed on the Plaintiff under the Maryland law.

## COUNT 6: Intentional Infliction of Emotional Distress and Conspiracy

295.    Plaintiff realleges and incorporates again all the allegations in paragraphs above herein.

296.    Defendants Anderson, Allen, Casares, Ginta Martin, Taylor, and Rivera engaged in extreme and malicious conduct when, either acting individually or in concert, they used Roe as a stooge to weaponize UMES's OIE office processes against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely.

297.    Defendants maliciously abused the investigatory and adjudicatory processes and contributed to the defective, prejudicial, unconstitutional, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

298.    Defendants maliciously did not provide sufficient notice with dates and times, refused to provide cross-examination, refused to show evidence for examination, refused

to apply the correct law and processes, predetermined a conclusion, presumed the Plaintiff guilty, predetermined the cruel punishment, and acted with actual malice and bias.

299.     Plaintiff suffered serious and pervasive economic and non-economic harm as a result of Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the Plaintiff prays that this court award relief as follows:

1. Enjoin defendants and the state from enforcing the Maryland State Policy on Sexual Harassment as unconstitutional and violative of the First Amendment;

2. Declare that the Defendants acted in violation of Title IX;

3. for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, fees, expenses, costs and disbursements, as well as injunctive relief directing UMES to: (i) reverse the outcome, findings, and sanction regarding the Roe complaint; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) take all steps necessary to return Plaintiff to the status quo ante;

4. for a violation of 42 U.S.C. § 1983 procedural due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, fees, expenses, costs and disbursements, as well as injunctive relief directing UMES to: (i) reverse the outcome, findings, and sanction regarding the Roe complaint; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) all steps necessary to return Plaintiff to the status quo ante;

5. Declare that the individual Defendants acted unlawfully and maliciously and engaged in a conspiracy to violate Plaintiff's rights;

6. Declare that individual Defendants do not have qualified immunity and that their actions were intentional and malicious;

7. On the count related to improper hiring, supervising, and training, award damages in an amount to be determined at trial, including, without restriction, damages to well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, and costs;

8. On the count related to intentional infliction of emotional harm, award damages from individual defendants to be recovered from their personal funds in an amount to be determined at trial including, without restriction, damages to well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, and costs;

9. Order Defendant 7 to commence disciplinary and termination proceedings against individual defendants and claw back unlawfully paid salaries and benefits to each of the Defendants 1-6;

10. Award such other relief and orders as the Court deems just and proper.


## JURY DEMAND

Plaintiff hereby demands trial by jury for all issues triable by jury.


## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing

existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A.

I agree to provide the Clerk's Office with any changes to my address where case- related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: 8/1/2025

Signature of Plaintiff _____

Printed Name of Plaintiff: Jacob Doe

Address: 11868 College Backbone Rd, Princess Anne, MD 21853

Tel: 724-931-2371

Email: jacobdoe2025@gmail.com