## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JACOB DOE**<br>**Plaintiff**<br><br>v.<br><br>**HEIDI M. ANDERSON**<br>**RONDALL ALLEN**<br>**JASON CASARES**<br>**ALEXANDRA GINTA MARTIN**<br>**MATTHEW A. TAYLOR**<br>**CECILIA RIVERA**<br>**UNIVERSITY OF MARYLAND EASTERN**<br>**SHORE**<br><br>11868 College Backbone Rd<br>Princess Anne, MD 21853<br><br>**Defendants** | **COMPLAINT FOR**<br>**DECLARATORY**<br>**AND INJUNCTIVE**<br>**RELIEF**<br>**AND**<br>**JURY DEMAND**<br><br><br>**Case No. 25-CV-**<br>**02528-JRR** |

---

## AMENDED COMPLAINT

The Plaintiff is a faculty member at the University of Maryland Eastern Shore (UMES). He observed the top administrators of the university engaging in criminal activities and filed complaints with law enforcement agencies which initiated investigations in response. Upon learning about the Plaintiff's complaints, the Defendants took retaliatory actions under the guise of a fake complaint alleging that the Plaintiff had created a "hostile working environment" for a temporary worker [Roe] whose contract was due to expire in two months. Plaintiff has never met Roe alone, never shaken her hand, and never been within six feet of her. Defendants started an investigation by the Title IX Director (Jason Casares: Def. 3) – who, according to publicly available news media reports, was allegedly a rapist and serial abuser of investigatory processes.

Plaintiff was abruptly ordered to attend a meeting with the Title IX Director on December 6, 2024. Jason Casares and Alexandra Ginta Martin (Def.4) gave him two sheets of paper: one alleging that

he created a "hostile" and "intimidatory" working environment for Jane Roe, and the other placing him on immediate administrative leave. There was no further detail as to what Plaintiff had said or done. Plaintiff rejected the accusations and asserted the complainant had an ulterior motive because she was caught committing fraud. Casares did not listen; Plaintiff's keys, id card, and electronic equipment were seized, and he was escorted out by campus police.

The Defendants' unlawful gambit ran aground when they realized that their fabricated allegations would not meet the minimal requirements of Title IX. The Title IX Director then claimed that Title IX is not applicable to the investigation and instead claimed to apply a state law (State of Maryland Policy on Sexual Harassment in the Workplace) ignoring the fact that the Title IX regime is mandatory and it preempts state law. UMES is a public university receiving funds from the federal government and is mandated to apply Title IX in such cases. All the events claimed in the complaint occurred in the university; Roe was here on a student visa, other students and faculty were witnesses. In the investigation, Casares and Ginta Martin violated all due process protections, provided no evidence, no opportunities to cross-examine any witnesses, or otherwise challenge the flimsy and vague fake charges. The Plaintiff's then attorney showed the Defendants that even if their allegations were taken fully at face value, it did not satisfy the definition of harassment or intimidation or hostile environment. Plaintiff repeatedly demanded Title IX and due process requirements be followed but was ignored. Not one of the alleged text messages were sent after the complainant joined UMES. The complainant had applied for the role and relocated from another state after receiving the alleged messages and responding in a friendly manner. The Defendants issued a finding that even though nothing that the Plaintiffs did was "severe or pervasive," he should be removed from his current role and demoted to a much lower role of a different type with half his current pay. The Plaintiff appealed that Title IX was the mandatory applicable law and that the state law was preempted. The appeal authority was Rondall Allen (Def.

2), who had an ulterior motive because the Plaintiff had filed a complaint against him. He denied the appeal without even a pretense of considering the appeal grounds.

This complaint is being brought to redress the severe harm that has been caused to the Plaintiff by the Defendants' willful and malicious actions. Plaintiff pleads that the court order Defendants to follow the law, apply the correct mandatory legal rules, accord due process protections, and cease their unlawful actions. Assuming *arguendo* the Title IX does not pre-empt the state law, Plaintiff challenges the constitutional validity of the State of Maryland Policy on Sexual Harassment and asks for a declaration that it is unconstitutional and should be struck down. Finally, the Plaintiff seeks reinstatement to his prior position with full rights, an injunction against acting on the appeal authority's decision, and punitive damages.

## I. PARTIES

1. Plaintiff Jacob Doe resided in Maryland at all times during the facts detailed in this complaint. He is a tenured professor at the University of Maryland Eastern Shore (UMES). Most of the facts giving rise to this complaint arose in Maryland.

2. Defendant 1 is Dr. Heidi Anderson, President of UMES.  She is a Maryland resident.

3. Defendant 2 is Rondall Allen, Provost of UMES. He is a resident of Salisbury, MD.

4. Defendant 3 is Jason Casares, Title IX Director and Director of the Office of Institutional Equity (OIE). He is a resident of MD.

5. Defendant 4 is Alexandra Ginta Martin, Assistant Director of OIE, a Maryland resident.

6. Defendant 5 is Matthew Taylor, General Counsel of UMES. He is a Maryland resident.

7. Defendant 6 is Cecilia Rivera, Associate Director, OIE, a Maryland resident.

8. Defendant 7 is the University of Maryland Eastern Shore, a university within the University System of Maryland based in Princess Anne, Somerset Co., MD. It receives Title III, Title IV and

other federal funds from the US government. It is required to certify compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 ("Title IX").

## JURISDICTION AND VENUE

9. This is a civil action arising under the laws and Constitution of the United States. This court has jurisdiction pursuant to 28 U.S.C. §§ 1131 and 1367. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02. This court has authority to award costs and expert fees under 42 U.S.C. § 1988.

10. Venue lies in this district court pursuant to 28 U.S.C. § 1391(b) because the defendants are Maryland residents and their unlawful actions individually and collectively were conducted within Maryland.

## FACTS COMMON TO ALL COUNTS

11. The Plaintiff took up a position at the University in 2023 with the desire to help improve an institution producing some of the worst outcomes in the nation.

12. Defendant 1 Heidi Anderson became President of UMES in 2018. She was selected because of a prior relationship with Chancellor Perman of the University System of Maryland (USM) despite the absence of any apparent qualifications and a record of previous problems.

13. UMES had a healthy enrollment of about 4800 students when Heidi Anderson took office in 2018; the university's current claimed enrollment is about 3000.

14. Under Anderson's watch, UMES is embroiled in scandal, and academic standards and governance have been sabotaged and there are numerous complaints against her (**EXs 1,2, 2A**).

15. Defendant 2 Rondall Allen became Provost around 2022. He has a weak academic record, background in discount pharmacies, and no record meriting a provost position. He was appointed because of previous connections to Defendant 1 and is a key member of the campaign.

16. Defendant 3 Jason Casares was promoted to his current position by Defendant 1 and paid a massively inflated salary in exchange for suppressing complaints against her and her toadies, and intimidating faculty and staff who oppose illegal activities. Casares has a public news media record as an alleged rapist and alleged abuser of Title IX policies at other universities and has been a named defendant before other courts. He led the investigation against the Plaintiff.

17. Whistleblower complaints were filed against Casares by UMES employees shortly after his appointment detailing fraudulent claims in his job application. These were ignored. There were subsequent complaints about illegal activities including obstruction of justice, illegal entry, surveillance, intimidation, and conspiracy (**EX2**). Anderson and USM Chancellor Perman ignored them. He is paid an inflated salary as a bribe by Anderson.

18. Alexandra Ginta Martin was hired by Casares and paid an inflated salary despite possessing no prior experience due to her willingness to engage in unlawful activities.

19. Matthew Taylor has been the General Counsel of UMES since about 2015. He is a key enabler of unlawful acts, and abuses legal rules with mala fide intent.

20. Based on direct observation, Plaintiff found rogue administrators led by the president Heidi Anderson and provost Rondall Allen turning the vast investments by the federal and state governments in the university into a private looting opportunity.

21. Unsurprisingly, under Heidi Anderson, UMES is frequently in trouble with federal investigations, audits, notices of non-compliance, and inquiries.

22. After witnessing criminal activity, Plaintiff filed reports against Defendants 1 and 2 with the USM Board and law enforcement. Federal investigations were launched and are ongoing.

23. The USM initiated a cosmetic investigation intended to save Anderson but could not avoid learning about scams under Anderson and Allen reported via the USM Fraud Hotline (**EX3**).

24. After being tipped-off, Defendants started a retaliation campaign against the Plaintiff.

25. Jane Roe is an international student who was employed as a temporary worker by the Plaintiff. Her legal ability to work is from her status as a student.

26. Allen, Anderson, and Casares weaponized Roe after learning that Roe had been reprimanded by Plaintiff for submitting fraudulent worksheets and not attending work.

27. On December 5, 2024, after work hours, Jason Casares asked Plaintiff to attend a meeting on December 6th. He refused to answer what the meeting was for despite two inquiries.

28. During the December 6th meeting, Casares and Ginta Martin placed Plaintiff on administrative leave accusing him of creating a "hostile and intimidatory work environment" for Jane Roe. Casares informed Plaintiff that a Title IX investigation would ensue.

29. On December 11, 2024, Professor X, a faculty member and colleague of Plaintiff emailed Ginta Martin stating, "I am the only person who works with [Roe] ... She is a temp worker and I coordinate all communications between two parties. They only met in-person six times (all at the public areas) and one virtual meeting. I arranged all those meetings and was present as an eyewitness on every occasion. Your office has never contacted me for investigation before putting [Plaintiff] on leave." (**EX4**)

30. On December 12, 2024, Plaintiff's then counsel wrote to Defendant 5 telling him that "Roe is a temporary employee housed in a separate building" with whom Plaintiff "has met no more than six times, never more than for a few minutes, and always in the presence of a witness." The counsel's letter named Professor X who attended every meeting with Roe. (**EX5**)

31. Plaintiff's counsel's stated "Manifestly, [Plaintiff] has never been in a position to intimidate or harass [Roe]" as Professor X can confirm. The letter noted that counsel is aware that Defendant 4 Ginta Martin is attempting to develop support for Roe's "specious accusation."

32. Defendant 5 ignored the letter. Defendants did not contact Professor X.

33. Throughout December 2024, individual defendants engaged in a mad scramble to procure anyone to say something negative about Plaintiff as part of a smear campaign.

34. Plaintiff learned about this and obtained sworn notarized affidavits from Jane Coe 1 and Jane Coe 2 testifying that Casares and Ginta Martin had interviewed them under coercion and sought to get them to speak negatively about Plaintiff. Coes 1 and 2 swore under oath that Plaintiff had always behaved respectfully toward them and he was a decent person. (**EX6, EX7**)

35. In December, Plaintiff filed a complaint against Jason Casares but was ignored.

36. In early January 2025, Ginta Martin wrote to Plaintiff summoning him to a meeting as part of her investigation into the accusation.

37. Plaintiff attended the meeting on January 21, 2025, along with his counsel.

38. Plaintiff and counsel both denied the accusations, reiterated that Plaintiff had never met Roe alone, that her accusations were baseless and pretextual. They reiterated that Roe had an ulterior motive because she was caught submitting fraudulent work and not attending to her duties. Ginta Martin thrust a 2-page document which contained "Notice of Allegations" at Plaintiff.

39. The Notice contained about 10-15 phrase statements allegedly attributed to Plaintiff. There were no dates, times, or locations, and no indication when they were uttered or in what context. Taking the alleged comments in the most favorable light to Defendants, the worst of the statements were, "people say Turkish women are beautiful, but I prefer Persian women," "all work and no fun makes [Roe] a dull girl," and asking for "pics" of an event Roe attended. (**EX8**)

40. Plaintiff responded that the contents were false and concocted and that he would respond in writing. He also challenged the absence of dates and other details establishing that OIE had any jurisdiction in the matter because it was not evident that the comments were made after Roe was employed at UMES – a precondition for OIE's investigatory powers.

41. During the meeting, Plaintiff asked Ginta Martin to provide an update into his complaint against Jason Casares. Ginta Martin was flustered and responded that she would "check and get back to him." The meeting ended.

42. Notably, Roe's contract was due to expire in about 3 weeks from this meeting.

43. On January 21, Ginta Martin wrote to Plaintiff asking him to provide a written response by January 24, 2025: less than 3 days after the meeting.

44. On January 24, 2025, Plaintiff and counsel submitted two documents in response to Ginta Martin: a legal analysis by counsel and factual response by Plaintiff.

45. Plaintiff's counsel wrote that nowhere do the allegations note that Plaintiff's comments were "unwelcome" to Roe and cited *Albero v. City of Salisbury*, 422 F. Supp. 2d. 549 for the proposition that the analysis was objective rather than subjective. Counsel stated, "even if one adopts complainant's allegations wholesale, they cannot constitute sexual harassment as a matter of law because the complainant never objected, protested, or complained about the conduct attributed ... Had she done so, and had [Plaintiff] persisted, then and only then would it have become necessary to determine if the conduct was "severe" or "pervasive". (**EX9**)

46. Counsel wrote "[Plaintiff] disputes the accuracy of [Roe's] allegations, even if one assumes arguendo, they are true, they fall short of attributing to him a sexual animus... the "comments are not overtly sexual and certainly fall far short of the severe-or-pervasive standard."

47. Counsel denied any impropriety in connection with Roe and "regards her complaint as pretextual and the University's handling of it as retaliatory."

48. Counsel closed by asserting that the "complaint should be dismissed as untenable."

49. Plaintiff asserted that the accusations were false and the "OIE staff ... are engaging in a pretextual witch hunt against me despite conclusive exculpatory evidence. This biased "investigation" is in retaliation for a criminal complaint filed against UMES President ..."

50. Plaintiff stated he had provided Roe with "critical feedback for impaired cognitive performance ... and for not producing work products of acceptable quality within deadlines. These ... provided the unlawful motivation for [Roe's] fabricated allegations." (**EX10**)

51. Plaintiff stated, "I have never met [Roe] in person without other employees being present. I have never even shaken her hand. I have never been within 6 feet of her. I have had no physical contact of any kind with her. I categorically reject the allegations as fabricated, concocted, manipulated, and manufactured with malicious motivations."

52. Next, Plaintiff pointed out the Notice of Allegations only had a "word salad that you have deliberately and maliciously sequenced as a monologue with no context, dates, or actual production of the cell phone to create a flimsy innuendo does not constitute sexual harassment, intimidation, or any kind of harassment."

53. Plaintiff noted that "Not a single word ... has any connection with anything sexual."

54. He wrote, "... the flimsiness of the innuendo – even assuming arguendo the ... fabrication at face value – highlights how it does not satisfy even the weakest definition of harassment ..."

55. Plaintiff also highlighted the fatal flaw in the Defendants' fraudulent allegations: the absence of dates and acknowledgment by individual Defendant 4 that the comments were prior to Roe commencing employment. He wrote: "as you yourself admit, the word salad presented was "temporally" long before [Roe] was an UMES employee. She was not even an applicant for employment. Communications between a stranger to the university and me on matters completely unrelated to the university are beyond the jurisdiction of your office."

56. Further, he reiterated "this maliciously fabricated complaint is a pretextual witch hunt that will not stand up to scrutiny before any rational person much less in any court of law. It does not satisfy the definitions of sexual harassment, harassment, or intimidation. ..."

57. Defendants provided no response to this strong rebuttal.

58. Defendants employed an evasion strategy. On January 27, 2025, Ginta Martin asked Plaintiff to attend a follow-up meeting side-stepping the written responses provided.

59. Plaintiff replied that he had "not received an update about ... my complaint against Casares. As noted ... we have plenty of evidence about the OIE staff's bias ... we can do any further follow-ups in writing. ... You mentioned this was possible during our last meeting." (**EX11**)

60. Ginta replied on January 28th stating "... do need to meet and reconnect in-person during the week of February 3 through February 7, 2025." (**EX12**)

61. Ginta Martin's email on the 28th again did not address the clear and convincing denials, legal analysis, and conclusions detailed in Plaintiff's email on January 24th.

62. Plaintiff responded on the same date (28th) asking, *inter alia*, "What happened to the complaint against Jason Casares? ... I need my questions to be answered in full."

63. On January 29, Kristin MacFarlane, apparently counsel for UMES wrote to Plaintiff's counsel stating that Plaintiff "is still inquiring about his complaint against Jason Casares (and possibly Alexandra Martin and Cecilia Rivera). The University's position is that OIE staff were simply processing the complaint against [Plaintiff]."

64. On February 6, 2025, Plaintiff wrote to her and her supervisor Katherine Bainbridge:
>"OIE staff are not "simply processing the complaint against" me. They are engaging in serious unlawful activities. ... USM, UMES, and the AG's office have been on notice about illegal activities by Casares and Anderson for a long time.
>So, let's not be disingenuous and willfully blind.
>I was simply doing my job when I encountered fraud, its cover-up, willful refusal to follow the law, and was forced to file a whistleblower complaint in June and September 2024. ...
>Please do your job in accordance with ABA Model Rules 1.13, 1.1, 1.2(d), 1.3,    and 8.4(c) and (d). As you know, your duties are to USM and UMES – not to the criminal gang currently controlling UMES. I request you to investigate Casares, Martin, Rivera, and others named in the     attached complaint. ... I hope you will do your duty ..."

MacFarlane and Bainbridge simply ignored the email. (**EX13**)

65. On February 19, 2025, Roe's contract should have expired thereby concluding this investigation. Apparently, Defendants extended Roe's contract to keep the complaint alive. It was a bribe in furtherance of the conspiracy against Plaintiff: pay without any work.

66. On February 21, Ginta Martin emailed Plaintiff stating, "It is our understanding that you have been communicating with other entities ... we encourage you to refer any questions or inquiries related to those complaints to the entities in question...."

67. Ginta Martin threatened Plaintiff: "... failure to respond to this email  ... and meet with our office  ... will result in you being placed in unpaid administrative leave.  ..." (**EX14**)

68. Ginta Martin also asked Plaintiff: "prior to your arrival, please provide the passcode (that you generated) for your University-issued/owned cell phone." This was in reference to the cellphone that had been seized by Casares on December 6th.

69. Ginta's email again evaded the submissions made in Plaintiff's January 24th email asking for closure of the untenable allegations as mandated by law.

70. On February 24th, Plaintiff forwarded Ginta's email to the Chairperson of the Board of Regents of USM to report the unlawful threat to put him on unpaid leave. He also inquired:

> "What is the status of the complaint I have filed against these people for serious criminal activity? ... UMES employees with serious complaints by multiple victims have not been put on any administrative leave. This includes Heidi Anderson, her husband Leon Roberts, Jason Casares, and Rondall Allen. ...
> Jason Casares and Alexandra Martin's salaries were increased shortly after complaints were filed against Heidi Anderson's husband Leon Roberts for lewd behavior toward UMES students in 2021/22. As you know, that case was covered up by a sham investigation conducted by Jason Casares. Clearly, the increase in salary was a bribe paid in exchange for the cover-up...."

71. On February 24, 2025, Plaintiff wrote to Ginta Martin attaching a legal memorandum (**EX15**): "Please send me a copy of the actual complaint allegedly submitted by [Roe]. Notably, her contract ended on February 19, 2025. What is her current employment status?" .... Previously, when told that your actions may be violating the law ... you have scoffed dismissively, exhibiting contempt ... Other faculty have also reported similar conduct ...."

72. The email text specifically asked for an opportunity to cross-examine Roe and another witness used by Ginta to pad her false allegations:

"... you have not indicated the date when I may cross-examine [Roe] and [her friend]. Please provide some dates and times for me to review for the cross-examination. ..."

73. The memorandum attached to that email asked for a copy of the complaint filed:
"You have alleged that there is a complaint in which I am a Respondent. Where is this complaint? I have not been provided with a copy. Please provide a copy immediately."

74. The memorandum argued that the definition of harassment was not satisfied:

"Your notice of allegations contains nothing that satisfies the definition of sexual harassment in Title IX. There is nothing even remotely sexual in the word salad you have stated in your Notice of Allegations, no 'sexual conduct,' no 'unwelcome conduct' of any kind, and nothing that is 'severe, pervasive, or objectively offensive.'

75. Next, the memorandum attacked the Plaintiff's being placed on leave:
"The administrative leave action ... is disciplinary, punitive, and unreasonably burdens me. My work area is about half a mile from [Roe's] office, and I have never met her one-on-one and had no contact with her on a daily basis. In fact, my interactions with her were minimal and always in the presence of others. ... You have continued to pay her since December without doing any work. This is violative of Title IX's ... requirements."

76. The memorandum highlighted the biased and predetermined nature of the investigation:

"The termination of my email, banning me from campus, ... telling people on campus that I have been fired, stopping my important work, posting my photograph in the campus police department, defaming me with students, etc., are all unreasonable burdens. This is a clear violation of Title IX's injunction ... section 106.44(a) states in material part that "A recipient's response must treat complainants and respondents equitably ..."

77. The Plaintiff's February 2025 memorandum exposed Defendants' bias:

"Section 106.45 requires that you conduct "an objective evaluation of all relevant evidence ... Jason Casares ... been frantically trying to pad the fabricated complaint by pressuring others on campus to make up falsehoods. Casares interviewed potential witnesses and tried to coach them. Rivera's communications ...exhibited bias ..."

78. The memorandum specifically highlighted that Defendants had not contacted Professor X at all despite her being identified as early as December 11th as possessing conclusively exculpatory evidence. Professor X had directly emailed Ginta Martin stating that she was a witness to every interaction but received no response at all. The memorandum noted:

"The statutory mandate to evaluate exculpatory evidence has been completely ignored. ... Similarly, there is incontrovertible evidence that I never met [Roe] alone, never was within 6 feet of her, and had no inappropriate interactions with her. ..."

79. The memorandum highlighted Defendants' conflict of interest and bias:

12

"You and OIE staff are biased and have an actual conflict of interest. You procured this complaint in conjunction with Heidi Anderson's gang ... in retaliation ..."

80. The memorandum asserted that Defendants violated the presumption of innocence:

"Your conduct ... pressuring others to make negative statements against me, and the statements by you ... that I have been fired, the removal of my bio ..., the termination of my email ... all show ... you have not maintained the presumption of innocence."

81. The memorandum challenged the jurisdiction and procedural errors by the Defendants:

"OIE also violated section 106.45(2) which requires specific steps to be taken in relation to the Notices of Investigation and Allegations. ... violations are not trivial - they are substantial and establish that your office lacks jurisdiction in this matter given your own admission in January that many of the alleged statements were before [Roe] was an employee..."

82. Finally, the memorandum asserted Defendants' legally binding duty to dismiss the complaint:

"Section 106.45(3) mandates OIE to dismiss a complaint when "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved." We have explained to you in considerable detail ...why the allegations do not meet the Title IX definition of sexual harassment. ... The statute uses the words "must dismiss" and the language is binding and unambiguous. ..."

83. Ginta Martin provided no response to the email of February 24th or the attached memorandum.

Defendants evaded their legal duties.

84. On February 26th, Ginta Martin evaded again asking Plaintiff to attend another meeting.

85. On March 3rd again she ignored the demands for a copy of the complaint, the evidence, an opportunity to cross-examine witnesses, etc.

86. Plaintiff replied on March 4th:

"Good afternoon, Ms. Martin. It is common knowledge at UMES that you do not like to obey the law and have contempt for legal institutions. ...
All interactions between you and I are to be conducted within the boundaries of Title IX. If the statute says you must do something, you <u>must</u> do it whether you like it or not. If you make any demands, you must reference a statutory provision that supports your claims. I regret that I cannot indulge your whims." (**EX16**)

87. The email specifically inquired about a lack of response to the points made by the Plaintiff in the February 24th email and memorandum:

"It appears that you have not read my email response sent on February 24th. Please read it carefully again (text below in addition to the attachment submitted on 24th), consult ... you must follow the mandatory provisions and must dismiss the complaint ...."

88. Ginta Martin and Defendants provided no response to this email. There was no communication from Defendants for over 6 weeks.

89. Defendants were in no hurry, violated all their deadlines whilst imposing harsh ones on Plaintiff, and had the ability to consult counsel. They deliberately chose to act unlawfully.

90. Abruptly, on May 19, 2025, Ginta Martin resurfaced claiming to have concluded the investigation and asking Plaintiff to attend a meeting to review a "preliminary report" beginning May 20th and offering some dates and times.

91. Plaintiff was about to travel overseas during that time for a 2-week trip.

92. On June 2nd, when Plaintiff was overseas, Ginta-Martin emailed a document purporting to be the Final Report of the investigation. Ginta did not even adhere to her own deadline.

93. On June 2nd, whilst overseas, Plaintiff replied:

"Hello Ms. Ginta Martin, ... I have not received a response to my email sent to you on 4 April 2025.... about my right to examine your "evidence", cross-examine the alleged complainant, and the status of my complaint against the rape-accused Jason Casares, amongst other matters. ... Perhaps you do not know that the Maryland law you reference is pre-empted by federal law? ...." (**EX17**)

94. The "Final Report" which is identical to the preliminary report purported to make "findings" against Plaintiff. Defendants imposed a massive demotion in rank and type of job, a reprimand on Plaintiff's file, and "training". Despite their actual malice, desperate attempts to manufacture evidence, coerce witnesses, and violate the laws, they had to conclude that Plaintiff's actions were not "severe or pervasive." The document was illogical, lied about witnesses interviewed, not supported by any evidence, and exhibited circular and incoherent reasoning.

95. On June 2nd, Plaintiff forwarded Ginta Martin's email to Matthew Taylor, Defendant 5:

"Hello Matt, Please see below. ... You know very well that I did not harass anyone or create any hostile environment for anyone... you went to a decent law school and took an oath to follow the law. Please uphold your responsibilities. No paycheck is worth sacrificing one's conscience for.... Please observe your oath, read my legal memo attached, and provide a confidential statement about ... the Anderson gang to the ... DoJ. ..." (**EX18**)

Defendant 5 Matthew Taylor did not respond.

96. On June 5th, Plaintiff forwarded the email to Katherine Bainbridge and her colleagues in the Maryland Attorney General's office and wrote (**EX19**):

Good morning. I hope you are doing well. Please see the below. Are you aware of the grotesque and willful violations of basic due process by the crooks at UMES? Ms. Bainbridge, did you see the memo I sent in February 2025 asking for specific details about the allegations against me? To date, I have not been provided with the dates on which I am alleged to have created a hostile environment/harassed the alleged complainant.... or any evidence. .... The previous provost, CFO, and head of Human Resources were all pushed out illegally because they were honest and resisted criminal activity. ...

The fake and fabricated allegations against me will collapse with the simple responses to these basic questions:

What were the remarks constituting harassment/hostile behavior?
When did the conduct occur? What are the dates for each comment?
What was the response of the supposed victim?

The refusal of the OIE ... shows they know their fabricated house of cards will collapse.

From the claims, it appears that some of the comments were made before ... (Roe) even applied for a job at UMES or was under any realistic prospect of such employment. ...

The list of due process violations is long and destructive of any notions of an impartial investigation. It would be an embarrassment to the OAG to defend this.

Ms. Bainbridge, ... You are an officer of the court and are working for the state. How can you participate in these grotesque abuses of due process ...The USM hotline has received information ...about illegal activities by Anderson's gang. Have you asked them to show you those complaints? ...It is impossible to hide any of this. How are you going to stand up in court and defend the actions of these criminals? ... "

97. Surprisingly, Katerine Bainbridge did not respond.

98. On 8th June, Plaintiff again wrote to Bainbridge to follow-up (**EX20**):

"Hello Ms. Bainbridge and colleagues, I have not received a response ... I have not been provided even the most minimal procedural and substantive due process rights mandated by

the US Constitution, Title IX, and numerous court decisions. ... No dates, times, or any evidence has been provided to me to date. The rape-accused Casares and his cronies are acting as judge, jury, and executioner in exchange for bribes paid by Heidi Anderson.... ...Thanking you, Sincerely,"

99. Plaintiff attached sworn affidavits from 2 witnesses who testified about being coerced in interviews by Casares and Ginta Martin.

100. Plaintiff also attached a statement by 6 female Iranian students that Plaintiff had only behaved respectfully with them. It was offered by the students themselves and emphasized their "full and unwavering support" for Plaintiff and stressed that "he has consistently served as a dedicated academic mentor, advocate and principal investigator who has guided us through our research journey with utmost professionalism, compassion, and integrity." (**EX21**)

101. The six female students communicated their apprehension about the "apparent campaign to discredit [Plaintiff]. These actions are, in our view, unfounded and represent a misuse of institutional power and jeopardizes not only his reputation but also our educational futures."

102. Critically, the students clearly stated they had never witnessed "any misconduct or mismanagement" by Plaintiff and "on the contrary, he has always acted in accordance with university and federal guidelines and has tirelessly advocated for our academic rights."

103. The students ended by pleading for Plaintiff to be "treated fairly and any attempt to falsely implicate him be stopped immediately. He deserves institutional protection not retaliation for standing up for truth and student welfare."

104. Again, there was no response from Katherine Bainbridge and her colleagues.

105. Plaintiff submitted his appeal in a timely manner on June 9th, asking Ginta Martin to "Please identify the appeal authority so that additional information may be delivered directly .... The OAG

staff are being copied to ensure that there is no pretence about their lack of knowledge of these illegal acts by your gang. ..." (**EX22**)

106. Ginta Martin acknowledged the email but did not identify the "appeal authority." (**EX23**)

107. Plaintiff's appeal submission challenged the nonsensical "findings" noting the pretextual nature of the investigation and bias throughout (**EX25**):

> "The "report" is absolute gibberish ... even lie about the most basic facts such as the witnesses interviewed -- conveniently omitting the names of several witnesses they interviewed from the list on page 3 of their fraudulent report. ...we have sworn testimony from individuals who are not named as "witnesses" that they were in fact interviewed by Casares and Ginta and attempted to be coerced."

108. Plaintiff was under no illusion that the appeal would also be biased against him writing: "This appeal ... is being submitted without any expectation that the OIE ... will follow the law ... the anticipated illegal actions...will only underscore their criminality ...."

109. Plaintiff's appeal challenged the willful refusal to follow mandatory law:

> " The violations of applicable legal protections are willful, malicious, and with the apparent aid of the UMES General Counsel. Absurdly, the OIE crooks err even about one of the most basic questions in this case: the applicable legal regime. .... after realizing that their fake case would go up in smoke, now claim for the first time in their "Final Report" that Title IX does not apply."

110. Plaintiff showed why Title IX is mandatory by its own language:

> "... General Counsel has apparently not advised the OIE crooks about the preemption doctrine and ... that Title IX must be followed and that its due process protections must be afforded .... The US Department of Education's explanatory memorandum issued whilst promulgating regulations states: "Title IX applies to all recipients of Federal financial assistance, whether the recipient is a public or private entity and regardless of the size of the recipient's student body (emphasis supplied.) ...The final regulations therefore prescribe (emphasis supplied) a consistent grievance process for application by all recipients without distinction as to public or private status, or the size of the institution."

111. Plaintiff explained that UMES receives federal financial assistance which is conditional on the university adhering to Title IX:

"UMES is a recipient of federal financial assistance.... ... must follow ... Title IX. The deliberate refusal to follow Title IX by itself means that UMES is discriminating against [Plaintiff] based on sex. .... This flows from Supreme Court case law including ...Cannon v. University of Chicago, 441 U.S. 677, 717 (1979). As the court explained in Cannon, "Title IX ... sought to accomplish two related, ... objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices."

112. The appeal memo stated:

"If any attorney can offer any putative legal reasons to support UMES's position, [Plaintiff] is happy to provide additional legal argumentation with supporting case law. This memo is also being sent to the Office of Attorney General so that there cannot be any pretense to lack of knowledge."

113. In the memorandum's factual background section, Plaintiff highlighted that Roe was in the US on a student visa and was hired to her temp position under that visa:

"Optional Practical Training (OPT), by definition, is part of educational activity at a US public university receiving federal funds - meaning that the OIE crooks' claim that Title IX does not apply in this case is absurd from the start."

114. It noted that Roe came to work cognitively impaired "smelled of weed or alcohol on numerous occasions and was frequently confused and clueless about basic matters such as the day/date and time, work instructions, deadlines, performance expectations, locations, names of UMES personnel, events, etc."

115. Plaintiff explained that:

"[Roe] did not seem to comprehend basic work instructions, could not work independently, and was not producing written work. [she] was requested to provide a daily report of her work activities prior to closing her time-sheet at 5pm each day. ... [Roe] failed to upload daily work reports despite numerous reminders.

When it became impossible to ignore that [Roe] was submitting fraudulent timesheets, [Plaintiff] sent her a polite email inquiring if she was actually working the hours claimed. [Roe] admitted that she was not working the hours claimed. ...

In late November 2024, [Roe] apprehended that her contract would be terminated and that she may be deported ... the consumption of drugs is a violation of immigration law."

116. Plaintiff outlined various other facts showing a conspiracy between Defendants.

18

117. The memorandum outlined a legal analysis noting, the "applicable legal regime for harassment allegations in the educational environment is provided by Title IX. In fact, this is why Casares and Ginta Martin referenced Title IX as the applicable law during the meeting on December 6, 2024. ...."

118. No reasoning was provided by Defendants for why Title IX was inapplicable – none exists.

119. Plaintiff explained the nature of mandatory rules:

"... mandatory legal obligations cannot be picked and chosen only when convenient and based on their whims. Mandatory legal obligations are precisely that - compulsory and applicable ..."

120. Section 1 of the appeal memo explained by Title IX is the mandatory regime:

"The 2020 Title IX rules are the mandatory legal rules governing this case. As the US Department of Education elucidated in its explanatory memorandum in 2020, "Title IX applies to all recipients of Federal financial assistance..."

That memorandum also recognized that UMES has additional obligations: "some recipients are State actors with responsibilities to provide due process of law to students and employees under the U.S. Constitution, including the Fourteenth Amendment." ... Section 106(6) (b) is unambiguous in its text: "**The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part**."

121. Next, Plaintiff asserted that Casares and other Defendants' refusal to follow mandatory laws

was willful and malicious:

"Section 106(6) (d) underlines the inalienable nature of constitutional protections that must be guaranteed to [Plaintiff]: "Nothing in this part requires a recipient to: (1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution; (2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or (3) Restrict any other rights guaranteed against government action by the U.S. Constitution." And section 106(11) relating to scope of application is equally unambiguous: "this part applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States..." Simply put, Casares and his toadies have no escape from Title IX ..."

122. Plaintiff noted that Casares had violated procedures from the inception:

"Casares has flip-flopped on the applicable grievance procedures and willfully violated the provisions of section 106 ... statute does not transition all complaints automatically into a

formal grievance process. It stipulates a number of factual and evidentiary thresholds for the Title IX coordinator to satisfy in section 106.44 (f)(v) A."

123. Plaintiff submitted that,

"Casares did not follow the mandate of this section at all. The allegations were completely spurious, not severe or repeated, and had nothing even remotely sexual. As such, Casares had a duty to dismiss the initial complaint ...."

124. Plaintiff asserted that Defendants were biased:
"Casares had already typed up the letter placing [Plaintiff] on administrative leave even without giving him an opportunity to be heard before the first meeting on December 6, 2024. This was a willful and malicious violation of basic due process. It shows that Casares was never interested in assessing the merits of the allegations, had predetermined the outcome to suit his criminal masters, and was absolutely biased. ... Further, there were ample facts contradictory of any harassment: application for a job by [Roe] after the comments were allegedly made, relocation by [Roe] ...[Roe] requested money from [Plaintiff], etc."

125. Plaintiff appealed that UMES violated mandatory grievance procedures:

"Section 106.45 of the statute elucidates the procedures to be followed by UMES. It is also phrased in language that admits of no ambiguity and is mandatory: "A recipient's grievance procedures for the prompt and equitable resolution of complaints of sex discrimination must be in writing and include provisions that incorporate the requirements of this section.""

126. Plaintiff appealed that he was not treated equitably as required by section 106.45(b).

127. Plaintiff appealed that Defendants had violated statutory requirements for notices:
"106.45(c)(1)(ii) mandates that the UMES issued Notice must contain "Sufficient information ..." The statute defines "sufficient information" as including "the identities of the parties involved in the incident(s), the conduct alleged to constitute sex discrimination... and the date(s) and location(s) of the alleged incidents." UMES intentionally violated the Notice provisions... [Plaintiff] requested the dates and times of the alleged incidents ...several times - on December 6th, in January, February 2025, and repeatedly since then ... refuse to provide dates ... because it would expose their fake allegations."

128. Plaintiff asserted that Defendants refused to provide dates because they knew that there was not even one comment made to Roe after her hiring at UMES and therefore they had no case.

129. Further, if Defendants added additional matters beyond what was stated in the Notice of Allegations, a separate notice with details is required. Defendants did not meet this requirement.

130. Plaintiff appealed that Defendants did not give him an opportunity to examine evidence despite repeated requests. Not even once. Given that it was all electronic evidence, it was costless for the Defendants to provide it for examination if it was genuine:

> "Clause (iv) also requires UMES to provide [Plaintiff] with an opportunity to examine the relevant evidence - in this case the cell phone of [Roe] which allegedly contains text messages. [Plaintiff] has requested access to this device to expose the fake allegations and to show the doctored messages. Casares and gang have simply refused to respond."

131. Plaintiff appealed that Defendants violated mandatory investigatory processes:

> "106.46(f)(2) specifies that UMES must "provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence ..." UMES violated this provision by deliberately hiding witnesses favorable to [Plaintiff] ...and refusing to collect evidence ... that [Roe's] allegations are fake."

132. Plaintiff challenged the refusal to allow cross-examination of witnesses and complainant:
> "The statute mandates the questioning of witnesses and parties ... "to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment." ...Despite repeated requests in writing, the OIE crooks have not provided an opportunity to cross-examine [Roe] or any audio or video transcript. ..."

134. Plaintiff submitted that Defendants determined credibility without cross-examination:
> "[Plaintiff] provided evidence that [Roe] had no credibility repeatedly. [Roe] submitted fake time sheets, was reprimanded for coming to work under the influence of drugs or alcohol, reprimanded for poor attendance and performance, and lied. She has zero credibility and her conduct subsequent to the alleged incidents destroys any implication that she experienced harassment...."

135. Regardless of whether they applied Title IX or the state of Maryland policy, the due process protections accorded by the US Constitution including the right to cross-examine one's accuser,

right to notice containing dates, establishment of jurisdiction to prosecute, etc., should have been provided to the Plaintiff. Defendants violated Plaintiff's due process rights.

136. Plaintiff submitted that Defendants willfully ignored his requests for cross-examination "because their entire case rested on ...[a] fraudulent edifice. The critical need for cross-examination has been upheld in a number of judicial decisions. For instance, in *Doe v. University of Cincinnati*, Judge Barrett ruled, "where a disciplinary proceeding depends on a 'choice between believing an accuser and an accused … cross-examination is not only beneficial, but essential to due process."

137. Plaintiff cited *Doe v. Baum et al* (2018), where the court ruled that:
"if a public university has to choose between competing narratives to resolve a case, the university must give the accused ... an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." Plaintiff pointed out ... was absolutely costless to require [Roe] to attend cross-examination."

138. Plaintiff quoted the *Baum* court's rationale and explained why the precedent applied:
"[Roe] frequently attended work appearing intoxicated and cognitively impaired. She had no recollection for basic facts, dates, times, people, locations, etc. Her memory and intelligence were very much in question. Even more devastatingly for Casares and [Roe], both had ulterior motives for fabricating these fake allegations. ... As in *Baum*, these proceedings must be quashed."

139. Plaintiff appealed that the definition of hostile work environment was not satisfied:

"Even reading [Roe] and Casares's fabricated allegations in the most favorable light and assuming everything to be true, the allegations do not satisfy the legal definition. As even Casares is forced to concede, they are not offensive, severe, or pervasive."

140. Plaintiff appealed that the Final Report should be quashed because it was:

"...full of irrelevant drivel and riddled with lies about relevant matters ... Final Report claims that [Plaintiff] did not participate in the proceedings. This is an absolute lie. [Plaintiff] attended meetings ... on 6th December and in January 2025. ... [Plaintiff] submitted detailed written responses in conjunction with his then legal counsel categorically rejecting and debunking the fake allegations. ...."

141. Plaintiff attacked Defendants' circular reasoning dressed up as "findings of fact:"
"... person of elementary intelligence and reasoning ability can read those so-called "findings" and discern that they are nothing but the OIE crooks' opinions..."

142. Plaintiff appealed that he had not been provided with any evidence:

"There is no date or timestamp on these supposed screenshots that appear to be manufactured by Photoshop. ...[Plaintiff] requested access to the cellphone to expose doctoring but OIE ...have not responded ... false conclusions being drawn by the OIE ...exposed ... by [Roe's] own statement on page 12: [Plaintiff] appeared "very friendly [towards her] at first," and she felt that she had to be friendly ...." Roe stated that [Plaintiff] was distant toward her from the moment she arrived at UMES. This absolutely destroys any claim about harassment ..."

143. Plaintiff again asserted that he had never met Roe alone:

"There are eyewitnesses that OIE was notified about that can verify these facts. As another example of OIE crooks' intentional illegal activities, Casares and minions did not contact these witnesses even once. And they deliberately hid witnesses who provided exculpatory evidence. ...."

144. Plaintiff attacked the supposed screenshots for not containing any dates or times:

"OIE purports to show doctored screenshots without any dates or timestamps of [Plaintiff] asking for "pics." Note that there is no suggestion that the pics were inappropriate in any form. For instance, even the doctored screenshots do not ask for inappropriate pics.

... this exchange was made before [Roe] was an applicant for a position at UMES, why did she apply for a position at UMES? If she felt harassed by the messages, why did she seek to come and work with [Plaintiff]? Why did she relocate ... if she was harassed? ..."

145. Plaintiff submitted:

the "only doctored screenshots provided with dates expose the allegations as fake. The <u>first instance of screenshots showing any dates are contained on page 13. The date is shown as August 8, 2024</u>. The message shows emojis sent by [Roe] laughing. This response by [Roe] conclusively debunks any claim that she was harassed or experienced any discrimination from any messages sent prior. In addition, the date of <u>August 8th is extremely significant. It was well before [Roe] commenced employment at UMES, relocated out of state to Maryland</u> from [...], and before she completed any paperwork for employment. ...The other screenshots with dates of August 13, and 17th also debunk any claim of harassment. They show friendly exchanges and meetings. Not once did [Roe] express any reservations about the alleged communications. There is not a shred of evidence that she objected to the humor or tone of the communications or indicate that they were anything but in jest."

146. Plaintiff challenged the Defendants' findings as illogical:

"If [Roe] felt harassed on August 17th, why did she wait until December ... until she was caught submitting false timesheets and coming to work impaired? Why are the OIE... unable to produce a single message after the date on which [Roe] started working at UMES ..."

147. Plaintiff challenged Casares's "finding" without a shred of evidence that Plaintiff invited Roe

to meet him in Washington DC before Roe was even an applicant for a job:

"Casares makes a conclusion without any evidence that [Roe] was invited to go to DC. He is unable to doctor any messages but still makes such a determination based just allegedly on Roe's statement. ... Even assuming for the sake of argument that Roe was invited to a meeting in DC prior to her commencing employment at UMES, Casares's unsupported and completely illogical suggestion that there is anything inappropriate about a meeting in DC needs to be quashed. ...If every meeting ... in Washington DC were to be deemed inappropriate, ... courts would be full of lawsuits ..."

148. Plaintiff challenged Defendants' "finding" that Plaintiff invited Roe to lunch:
Plaintiff "never invited [Roe] to a meal of any sort. As [Roe] herself admitted in the Final Report, [Plaintiff] rarely interacted with her, avoided her, and was distant..."

149. Plaintiff appealed the Defendants "findings" that:

"totality of the circumstances in this matter is sufficient to establish that [Plaintiff] engaged in a course of conduct constituted unequal treatment based on national origin and gender, which amounted to harassment and a hostile work environment in violation of the UMES Policy Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy, adopted by UMES" (page 24).
The "totality of circumstances" shows exactly the contrary. It shows that [Roe] has no credibility, made up false accusations that not even the OIE crooks could prop-up, was caught submitting fraudulent timesheets and coming to work under the influence of alcohol or drugs, and performed poorly at work. The totality of circumstances shows OIE staff manufacturing lies, ... this was a scam of a witch hunt organized by a criminal gang in retaliation for a complaint against Heidi Anderson ..."

150. Plaintiff appealed on the ground that the Supremacy Clause of the US Constitution mandated

the application of Title IX to this case. Plaintiff submitted:

"based on a plain reading of Article VI clause 2, Title IX preempts the Maryland Sexual Harassment policy and UMES policies that are in conflict. There is absolutely not even a shred of opportunity to argue this point because Congress explicitly stated such preemption in the plain wording of Title IX as noted previously in this appeal. As that quoted language notes, universities receiving federal financial assistance must apply Title IX provisions ..."

151. Plaintiff appealed that there was clear Congressional intent to preempt state law:

"Congressional intent to preempt any conflicting state law is expressly stated in the Explanatory Memorandum ... notes that sexual harassment allegations are substantially different in the educational context that other workplaces because of the implications of constitutional requirements such as the First Amendment, the use of federal funds, etc. It explains the deliberate legal protections including specific mandatory definitions ... and the need to ensure that innocent persons are not wrongly accused and punished."

24

152. Plaintiff pointed out that the Department ... explained why universities are different: "an institution of higher education differs from the workplace. ... these final regulations are consistent with the sense of Congress ... that "an institution of higher education should facilitate the free and open exchange of ideas."

153. Plaintiff argued that Title IX is the law based on the US Department of Education's published guidance available to UMES:

"these final regulations create clear legal obligations that facilitate the Department's robust enforcement of a recipient's Title IX responsibilities. The mandatory obligations imposed on recipients under these final regulations share the same aim as the Department's guidance."

154. Plaintiff submitted that Defendants' investigation applied the wrong legal standard: "OIE's failure to apply the correct legal standard, and the willful application of the wrong, preempted state law standard vitiate this fake investigation." Even if the state law had been applied, Title IX's procedural protections including cross-examination must have been provided to Plaintiff..."

155. Plaintiff asserted that UMES discriminated on the basis of gender by blindly believing Roe and ignoring his statements rebutting her assertions.

156. Plaintiff appealed about lack of evidence:

"Casares and gang just make up statements attributed to [Roe] and assume them to be true. ...[no]evidence to support these statements. [Roe] has been spotted partying and consuming drinks and alcohol in November and December and entertaining random men. ..."

157. Plaintiff appealed the Defendants' "findings" as biased noting that failure to treat him equitably as mandated by statute and the disproportionately favorable treatment of Roe.

158. Plaintiff pointed out specific provisions pertaining to supportive measures were violated by Defendants. These were mandatory and the violations were willful. Plaintiff had challenged his placement on administrative leave and ban from campus as legally unsupported and practically unnecessary given the minimal contact with Roe.

159. Plaintiff argued that Defendants violated the presumption of innocence: "Section 106.45 (b)(3) mandates a "presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures." The factual record shows a number of individuals connected to the Casares OIE crooked gang telling campus community members that "[Plaintiff] has been

removed," "he is never coming back", terminating his research illegally, displaying his photograph in a public area of the campus police department, etc."

160. Plaintiff appealed that Defendants intentionally concealed exculpatory evidence by lying about the witnesses interviewed who had provided exculpatory evidence. Defendants also intentionally refused to interview additional witnesses who knew the accusations were false.

161. Plaintiff appealed Section 106.45 (b)(6) mandates an "objective evaluation" of:
"all evidence that is relevant, as defined in § 106.2, and not otherwise impermissible under paragraph (b)(7) of this section—including both inculpatory and exculpatory evidence." Here, Casares and gang's Final Report lists the witnesses they claimed to have interviewed. There is no mention of the fact that they interviewed a full professor and three students who provided testimony that is fatal to this fake case. ... In addition, [Plaintiff's then counsel] notified OIE in December 2024 that the allegations have absolutely no merit and that all interactions between [Plaintiff and Roe] were witnessed by [Professor X]. Despite this clear communication, the OIE crooks made no attempt to contact [Professor X]."

162. Plaintiff submitted that Defendants had interviewed two witnesses with known animus towards him. These two witnesses were interviewed to drum up anything negative.

163. Plaintiff appealed the sanction imposed even though he did not do anything "severe or pervasive." Despite this "finding", Defendants imposed a sanction of demotion to a position paying half of what Plaintiff currently earned. He asserted the punishment was grossly disproportionate and violated the constitutional norm against cruel and unjust punishment.

164. Plaintiff stated that he would submit legal analysis to the appeal authority.

165. Defendants did not respond and although they would not have suffered any harm.

166. There was total silence from Defendants after this appeal submission and there was no decision within the timeframe stipulated in the Defendants' policies.

167. On June 24, Plaintiff emailed Matthew Taylor:
"Hi Matt, I am sending you the attached as a professional courtesy and to eliminate any pretense of lack of knowledge. ... I am sure you are familiar with Rules 3.3 and 4.1 of the ABA Model Rules... Please consider carefully and act within the confines of the law.... Thank you." **(EX24)**

168. Abruptly, on July 25th, Defendant Ginta Martin emailed Plaintiff a "Final Appeal Decision" issued by the appeal authority, Rondall Allen (Def. 2).

169. A reasonable person would have recused himself because of the clear conflict of interest and the appearance of bias. However, Rondall Allen apparently wrote the final decision.

170. Aside from the conflict of interest and bias, Rondall Allen should not have been the appeal authority due to sheer incompetence and the appeal decision is absolute gibberish.

171. The appeal authority simply evaded the appeal grounds and just recited what was in the Defendants' report in a short peremptory response without reasoning or logic. (**EX26**)

172. Under the Defendants' policies, Roe has to be provided the Plaintiff's appeal submission, and she is required to provide a response within 5 days. There is no evidence showing that Roe was provided with the Plaintiff's appeal submission or what her response was.

173. Rondall Allen does not seem to understand preemption, the supremacy clause, and mandatory legal rules. He did not cite the standard of review for the appeal, nor does he seem to understand what that concept is.

174. Incredibly, Rondall Allen claimed to have spoken to OIE Defendants *Ex Parte* to ask why Title IX does not apply. He swallowed wholesale their statement that Title IX does not apply without checking if they are right. He did not consult the General Counsel or seek input from Plaintiff. There is not even one line of reasoning explaining why Title IX does not apply.

175. Defendants would have known and ought to have known of the 4th Circuit's controlling law that cross-examination is an essential part of due process in such proceedings. Plaintiff was denied this right despite repeated requests. Rondall Allen did not address this point.

176. Rondall Allen does not appear to comprehend the need to consider exculpatory evidence and how not doing so is reversible error. He does not seem to understand the meaning of bias and makes conclusory assertions without responding to the specific points showing bias. **EX 26.**

177. On July 27, 2025, Heidi Anderson wrote to Plaintiff informing him that he has been demoted to a position of a different type paying less than half of his current salary.

178. As a result of Defendants' unlawful actions, Plaintiff has and continues to suffer immense damages. He has been demoted from leadership to a different type of role with negative impact.

179. Plaintiff's reputation has been irreversibly harmed, and he has been labeled an abuser, banned from campus and shunned by colleagues who are afraid of the criminal gang.

## II.  STATEMENT OF CLAIMS

### COUNT 1: Intentional Violation of 42 U.S.C. § 1983-Denial of Fourteenth Amendment Due Process and Conspiracy

180. Plaintiff incorporates the allegations in the paragraphs above herein and realleges them as if fully set forth again below.

181. The Fourteenth Amendment to the US Constitution states that no state shall "deprive any person of life, liberty, or property, without due process of law."

182. UMES is a public university, and it exists solely because of the Title IV and Title III funds it receives from the federal government and defendants are subject to the Constitution.

183. The serious property interest in Plaintiff's tenured leadership role merits the provision of due process protections by the Defendents including by way of proper notice of charges showing dates and locations of any alleged misconduct, an opportunity to examine and rebut evidence, an opportunity to cross-examine an accuser, hearing by an impartial fact finder, and have exculpatory witnesses be heard. *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

184. Plaintiff has a liberty interest in his good name, reputation, honor, earned career, employment opportunities, career advancement, and freedom – all violated by the Defendants.

185. Plaintiff has a right to be free from arbitrary demotion to a different type of role derived from UMES and USM policies and rules and state laws in addition to his contract.

186. Individual Defendants conspired to deprive Plaintiff of his due process rights to achieve a predetermined outcome in retaliation of the complaints he had filed against them.

187. Defendants violated Plaintiff's due process rights by failing to give him sufficient notice stating dates and times, failing to establish jurisdiction to process a complaint based on accusations before Roe was associated with UMES or connected to Maryland, failing to allow Plaintiff to examine evidence, failing to provide cross-examination of complainant and witnesses, deliberately ignoring exculpatory evidence, violating their own policies' timelines, failing to apply the correct legal standard, failing to apply the correct standard of review to the appeal, failing to be equitable in supportive measures, failing to follow the rules allowing Plaintiff to contest supportive measures, failing to follow conflict of interest rules, failing to refrain from bias, failing to observe controlling US Supreme Court and 4th Circuit case law.

188. Defendants acted in furtherance of the conspiracy after forming an agreement to retaliate because of Plaintiff's complaint against their crimes. Allen, Anderson, Ginta Martin, Matthew Taylor, Jason Casares, and Cecilia Rivera conspired, met, and acted to ignore demands for due process including applying the correct legal standards, withholding exculpatory witnesses, intimidating witnesses, coercing witnesses (e.g. **EX6,7**), defaming Plaintiff, falsely conveying that Plaintiff had been fired, concealing evidence, refusing to provide sufficient notice with dates, times, and locations of alleged misconduct, conducting an investigation into matters over which they had no jurisdiction because complainant Roe was not an employee at that time, manipulating and doctoring evidence to convey a false narrative, adding extraneous and irrelevant matters, deliberately claiming to make "findings of fact" when there were neither "finding" nor "facts" but just gibberish, and making illogical unlawful claims.

189. Matthew Taylor acted in furtherance of the conspiracy by deliberately communicating false legal advice, ignoring US Constitutional standards, and mandatory laws.

190. 42 USC Section 1983 provides that "Every person who, under color of any statute ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . ."

191. Individual Defendants knew that they were acting in violation of the law. Each of the Defendants has received training in Title IX and related policies and is aware of their legal responsibilities. There is no grey area or ambiguity, and they wanted to violate the law.

192. Defendants are not entitled to any kind of immunity.

193. Defendants' intentional actions in violation of the laws were in furtherance of a conspiracy against Plaintiff and included refusing to follow requirements for notice, jurisdiction, examination of evidence, cross-examination, and extending Roe's contract.

194. Plaintiff suffered serious and pervasive economic and emotional damages as a result of Defendants' unlawful actions.

195. Plaintiff is entitled to reinstatement and declaratory and injunctive relief.

**COUNT 2: Violation of 20 U.S.C. § 1681 et seq.-Title IX**

196. Plaintiff incorporates all the allegations in paragraphs above herein as if they were realleged and fully set forth again.

197. On February 4, 2025, the US Department of Education issued a Dear Colleague Letter stating "the binding regulatory framework for Title IX enforcement includes the principles and provisions of the 2020 Title IX Rule ... open Title IX investigations initiated under the 2024 Title IX Rule should be immediately reevaluated to ensure consistency with the requirements of the 2020 Title IX Rule ..." (**EX27**)

198. The DCL was read by Defendants but ignored because it frustrated their illegal scheme.

199. Defendants could not satisfy the requirements of the 2020 Rules and chose evasion instead of compliance, thereby intentionally engaging in unlawful activity.

200. 20 USC Section 1681 provides that "No person in the United States shall, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance." It is enforceable through an implied private right of action. See *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

201. Title IX applies to all institutions receiving federal funds via Title IV and as noted above, UMES is wholly dependent upon federal funds for its diurnal survival. Title IX applies to UMES, and it is required to certify compliance to the US Department of Education.

202. Defendants violated Title IX when it was clearly the mandatory legal regime governing this case, by failing to follow the February 4, 2025, DCL, failing to follow mandatory rules prescribed by Title IX, and arriving at an erroneous outcome against the Plaintiff.

203. Defendants' failure to follow Title IX was due to gender bias to appease pressure from previous Office of Civil Rights investigations, adverse findings, and negative media coverage.

204. Defendants misapplied, failed to apply, or violated its own policies with a discriminatory intent against Plaintiff thereby violating Title IX.

205. Defendants never once provided any plausible rationale for refusing to follow Title IX.

206. Defendants conducted their sham investigation in ways calculated to achieve their erroneous outcome to harm Plaintiff including by intimidating witnesses, excluding exculpatory witnesses, manipulating and doctoring evidence, bribing the complainant, exhibiting bias, failing to apply the correct legal standards, claiming their opinions are "facts", denying notice, denying cross-examination, denying any opportunity to examine evidence, failing to uphold the presumption of innocence, and a fake appeal process.

207. Defendants deliberately failed to follow witness testimony from Professor X and other witnesses as that would have destroyed Roe's claims.

208. The difference in evidence collection, treatment, credibility highlights discriminatory treatment. Roe's words are taken as the truth whereas the Plaintiff's statements and the statements by 8 student witnesses that Plaintiff acted respectfully was ignored.

209. Defendants' actions caused severe and pervasive harm to Plaintiff that is primarily capable of redressal by declaratory and injunctive relief and an award of punitive damages.

**Count 3: Violation of First Amendment – Freedom of Speech and Conspiracy 42 USC 1983**

210. Plaintiff incorporates all the allegations in paragraphs hereinabove.

211. Plaintiff had a constitutionally protected right under the First Amendment to freedom of speech and expression. Plaintiff's complaints against individual defendants engaging in criminal activities are protected by the First Amendment. Defendants' retaliatory actions and demotion of Plaintiff to a lower paid different type of position violate the right to freedom of speech.

212. Defendants started this fake investigation to signal to others that complaining against them would entail vicious retaliation and their actions are aimed at chilling speech.

213. Defendants knew their actions are unlawful and do not merit qualified immunity.

214. Defendants' unlawful actions caused Plaintiff severe and pervasive harm and is capable of redress only through declaratory and injunctive relief and reinstatement.

**COUNT 4: Negligent Hiring, Supervision, and Retention**

215. Plaintiff incorporates all the allegations in paragraphs above.

216. Defendant 7 owes a duty of care to Plaintiff to use care in hiring, supervision, and retention of its personnel including all the individual defendants.

217. Defendant 3 has a well-publicized public record as an alleged rapist and abuser of investigatory processes and rules.

218. Defendant 1 intentionally and maliciously promoted and paid exorbitant salaries and benefits to Jason Casares as a bribe for engaging in illegal activities on her behalf.

219. It was entirely foreseeable that employing Jason Casares would result in biased Title IX investigations, lawsuits, discrimination complaints, and serious violations.

220. Defendant 1 employed gang-recruitment tactics in selecting a person of manifest and documented illegal activities precisely because of his willingness to violate the law.

221. Defendant 1 deliberately and maliciously failed to properly train and supervise Jason Casares because she wanted to employ him for unlawful purposes including suppressing complaints against her and associates, and weaponizing Title IX for unlawful purposes.

222. Defendant 1 did not possess the qualifications, experience, or character to be appointed president of UMES. Defendant 7 did not train her or supervise her appropriately and was recklessly indifferent to her unlawful actions despite numerous complaints (**EX1, EX2**).

223. Defendant 2 had no qualifications to be appointed Provost. He did not possess the intellectual ability, competency, or experience necessary for such a position. Defendant 2 was not trained or supervised properly and Def. 7 was recklessly indifferent to his illegal acts.

224. Defendant 7's improper hiring, failure to supervise, train, and monitor all the individual Defendants was reckless and violated their duty of care and caused severe foreseeable economic, reputational, and emotional harm to Plaintiff.

225. The court can provide redress by ordering discipline and termination proceedings against individual defendants and can award money damages in an amount determined at trial. The court should order a writ of mandamus for Defendant 7 to commence proceedings under the "faithless servant" and honest services fraud doctrines to claw back salaries from Defendants 1-6.


**COUNT 5: The Maryland State Policy on Sexual Harassment Violates the First Amendment, is Unconstitutionally Vague and Overbroad, and must be struck down.**

226. Defendants intentionally adopted a ruse by seeking to apply the Maryland State Policy on Sexual Harassment because their fake case could not withstand applicable law.

227. This state law, adopted in 2022, drastically departs from federal law and drops the "severe and pervasive" standard. It is a content-based restriction on speech that violates the First Amendment to the US Constitution.

228. The Maryland law is unconstitutionally vague and overbroad.

229. Article 20 610(a) of SB 450 defines "sexual harassment" in vague and overbroad terms to include unwelcome and offensive conduct, which ***need not*** be severe or pervasive, when the conduct "the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile, considering the totality of the circumstances."

230. The Maryland policy reaches constitutionally protected speech that is merely offensive or unwelcome to some listeners. This upends the long-established judicial precedent and Congressional intent to only punish severe and pervasive offensive conduct.

231. The Maryland policy is overbroad by sweeping up any kind of speech content that a listener deems offensive or unwelcome thereby eliminating jokes, casual statements, or banal remarks that are harmless. It does not define prohibited conduct, offers no procedural protections, prohibits speech outside Maryland (e.g. the text messages here), and is facially unconstitutional.

232. It is well settled that the government cannot prohibit speech merely on the grounds that it is "offensive" or "unwelcome" to some listeners. Speech cannot be abrogated merely because it would cause discomfort to a hyper-sensitive listener such as Roe.

233. Plaintiff has standing to bring this constitutional challenge because he was directly harmed by the enforcement of the Maryland law. He was demoted after a farcical investigation based on this law, deprived of procedural and substantive due process, and deemed responsible based on vague and overbroad conclusions under the color of this law for speech outside Maryland.

234. Here, Defendants cited alleged private comments by Plaintiff from outside Maryland (MD) to Roe who was in Pennsylvania (PA) and unaffiliated to Defendants such as "that [Plaintiff] thinks Persian women are beautiful" as constituting sexual harassment under the Maryland policy illustrating its unconstitutional vagueness, overbreadth, and overreach.

235. There is no evidence that Roe is Persian and none was presented. Not all Iranians are Persians. Iran is a multi-ethnic country where Persians constitute a segment. A statement that Persian women are beautiful is pure opinion and constitutionally protected speech. Ditto the other statements attributed to the Plaintiff before Roe was hired that were sent from outside MD to a person outside MD without using any MD equipment or having any connection to MD.

236. Plaintiff had a free speech right to make the alleged comments to a non-employee.

237. Plaintiff repeatedly asserted that his comments were not harassing, had no interest in Roe, that she never objected to any comment, that she responded with smiling emojis, that the comments were made prior to her employment or even making an application for employment, and she never asked Plaintiff to cease making any comment.

238. Defendants themselves admitted that Plaintiff's conduct was not "severe or pervasive."

239. The plaintiff suffered an individual injury because of the unconstitutional Maryland law.

240. The Maryland law's vagueness, overreach, and overbreadth enables substantial violations of the First Amendment and due process rights by officials acting arbitrarily and discriminatorily.

241. In *DeJohn v. Temple University*, 537 F.3d 301, 320 (3d Cir. 2008), the 3rd Circuit Court of Appeals analyzed binding Supreme Court precedents and opined: "since the inception of overbreadth jurisprudence, the Supreme Court has recognized its prominent role in preventing a "chilling effect" on protected expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 630, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ...   This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the

lifeblood of academic freedom. As the Supreme Court in *Healy v. James* explained, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." The court's analysis resulted in its finding that the sexual harassment policy was unconstitutionally overbroad.

242. The Maryland law abrogates procedural protections and confers untrammeled and arbitrary powers to public officials, as in this case, to run kangaroo courts to stifle speech.

243. In the hands of Defendants, any statements can be twisted to meet the Maryland law's definition of harassment based on the vague and overbroad "totality of circumstances" regardless of to whom or where they were made. It can mean anything that an official wants it to mean.

244. The Maryland law will have a chilling effect on protected speech under the Constitution, especially in a university environment. As the Supreme Court has held, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]." *Healy v. James*, 408 US 169, 180 (1972). In *Rust v. Sullivan*, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Supreme Court "recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." In *Rust*, the Court noted that the "existence of a Government "subsidy," ... does not justify the restriction of speech in areas that have "been traditionally open to the public for expressive activity."

245. The government has no compelling interest that outweighs the Plaintiff's speech rights.

246. The plaintiff's injury can be corrected by striking down the Maryland law.

**COUNT 6: Intentional or Reckless Infliction of Emotional Distress and Conspiracy**

247. Plaintiff realleges and incorporates again all the allegations in paragraphs above herein.

248. Defendants Anderson, Allen, Casares, Ginta Martin, Taylor, and Rivera engaged in reckless and malicious conduct when, either acting individually or in concert, they abused processes calculated to lead to the predetermined punishment of Plaintiff.

249. Defendants maliciously and recklessly did not provide sufficient notice with dates and times, refused to provide cross-examination, refused to show evidence for examination, falsified evidence, intimidated witnesses, excluded exculpatory testimony, refused to apply the correct law and processes, predetermined a conclusion, presumed the Plaintiff guilty, predetermined the cruel punishment, and acted with malice and bias.

250. Plaintiff suffered serious and pervasive harm to his health because of Defendants' actions.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, the Plaintiff prays that this court award relief by:

1. Enjoining defendants and the state from enforcing the Maryland State Policy on Sexual Harassment as unconstitutional and violative of the First Amendment;

2. Declaring that the Defendants acted in violation of Title IX;

3. Awarding Plaintiff injunctive relief directing UMES to: (i) reverse the outcome, findings, and sanction for the Roe complaint; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) take all steps necessary to return Plaintiff to the status quo ante; awarding damages including punitive damages, prejudgment interest and costs;

4. Declaring that the individual Defendants acted unlawfully and maliciously and engaged in a conspiracy to violate Plaintiff's rights; do not have qualified immunity and that their actions were intentional and malicious or reckless;

5. On the count related to improper hiring, supervising, and training, awarding damages in an amount to be determined at trial, including, damages to well-being, emotional and

psychological damages, damages to reputation, past and future economic losses, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, and costs;

6. On the count related to intentional or reckless infliction of emotional harm, awarding damages from individual defendants to be recovered from their personal funds in an amount to be determined at trial including, damages to well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career opportunities, and loss of future career prospects, plus prejudgment interest, fees, and costs;

7. Ordering Defendant 7 to commence disciplinary and termination proceedings against individual defendants and claw back unlawfully paid salaries and benefits to Defendants 1-6;

8. Awarding such other relief and orders as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury for all issues triable by jury.

## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: 8/14/2025

Signature of Plaintiff _____

Printed Name of Plaintiff: Jacob Doe

Address: 11868 College Backbone Rd, Princess Anne, MD 21853

Tel: xxx-xxx-2371

Email: jacobdoe2025@gmail.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JACOB DOE**<br>**Plaintiff**<br><br>v.<br><br>**HEIDI M. ANDERSON**<br>**RONDALL ALLEN**<br>**JASON CASARES**<br>**ALEXANDRA GINTA MARTIN**<br>**MATTHEW A. TAYLOR**<br>**CECILIA RIVERA**<br>**UNIVERSITY OF MARYLAND EASTERN**<br>**SHORE**<br><br>11868 College Backbone Rd<br>Princess Anne, MD 21853<br><br>**Defendants** | **COMPLAINT FOR**<br>**DECLARATORY**<br>**AND INJUNCTIVE**<br>**RELIEF**<br>**AND**<br>**JURY DEMAND**<br><br>**Case No. 25-CV-**<br>**02528-JRR** |

## VERIFICATION OF PLAINTIFF

**JACOB DOE**, being duly sworn, deposes and says:

I am the Plaintiff named in this matter. I have read the annexed complaint and Exhibits, know the contents thereof, and affirm that the factual allegations contained in paragraphs 1-8, 10, 11-250 of the Complaint and the Exhibits are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

Signed under the pains and penalties of perjury, on this 14th day of August 2025.

Jacob Doe

40